308 Ga. 340
FINAL COPY

S19A1052. BAMBERG v. THE STATE.
S19A1054. BAMBERG v. THE STATE.

BOGGS, Justice.

After a 2009 jury trial, Damon Bamberg and his mother, Sonya

Bamberg, were convicted of murder and other offenses arising out of

the shooting death of Damon's ex-wife, Allison Nicole "Nikki"

Bamberg.[1] They appeal, asserting error in the reconstruction of a

missing transcript of the first day of trial and in the denial of their

---

[1] The crimes occurred in the early evening of January 18, 2008. On February 12, 2008, a Jeff Davis County grand jury indicted the Bambergs for malice murder, felony murder, two counts of aggravated assault, possession of a firearm during the commission of a crime, criminal damage to property in the second degree, and cruelty to children in the first degree. At a trial from August 31 to September 3, 2009, the trial court directed a verdict on the cruelty to children charges, and a jury found the Bambergs guilty of all remaining charges. The trial court sentenced the Bambergs to serve life in prison for malice murder and a total of 30 years to serve consecutively on the remaining charges. The trial court merged one aggravated assault charge into each malice murder conviction, and the felony murder charges were vacated by operation of law. On October 22, 2009, the Bambergs filed separate motions for new trial. Damon's motion was amended by new counsel on August 5, 2016. Sonya's motion was amended by new counsel on August 5 and 10, 2016, and February 21, 2018. On December 27, 2018, after a joint hearing, the trial court denied the motions. Damon and Sonya each filed a timely notice of appeal on January 28, 2019. Both cases were docketed in this Court for the August 2019 term and submitted for decision on the briefs.

motions to reopen the evidence to submit a transcript of a "true crime" television show. In addition, Damon asserts insufficiency of the evidence and error in the admission of a statement made by Sonya, and Sonya asserts that the trial court impermissibly commented on the evidence and the credibility of witnesses. For the reasons stated below, we affirm.

1. Construed in the light most favorable to the jury's verdicts, the evidence presented at trial showed that Damon and Nikki Bamberg had a contentious and violent marriage that ended in divorce.[2] At the time of the events at issue here, the parties were separated, and Nikki was living in an apartment in Hazlehurst, in Jeff Davis County. Witnesses testified that, on several occasions, Damon was violent with both Nikki and his first wife. Nikki's friend and co-worker testified that Sonya told Nikki in the friend's presence, "I will see you dead before I let you have those boys," referring to Damon and Nikki's two children. Two witnesses

---

[2] Nikki's domestic relations attorney testified that the divorce was filed in 2006 and became final on January 14, 2008.

testified that in October or November of 2007, Sonya approached one of them while Damon was present and solicited one of the witnesses to murder Nikki for $25,000. In November 2007, Damon took out a $50,000 life insurance policy, with a rider in the amount of $150,000 for accidental death, on Nikki and named Sonya as the beneficiary. While confined in the Jeff Davis County jail on the instant charges, Damon told a fellow inmate, Burtis Taylor, that "Mama said it's elimination time." Police officers and GBI agents found a calendar on Damon and Sonya's refrigerator that had Friday, January 18, 2008 marked with a "frowny face" and the words, "hell begins."

On January 18, 2008, four days after the divorce became final, Nikki drove to a convenience store in Uvalda, in Montgomery County, to deliver the couple's two children for visitation. Damon and Sonya were in a distinctive car, a 1972 Chevrolet Chevelle with a skull and crossbones front license plate.[3] Investigators from the Jeff Davis County Sheriff's Office and the GBI testified that the

---

[3] The children, who were three and five years old, apparently got into the Bambergs' car, but they were not called as witnesses at trial.

convenience store video surveillance cameras showed that Nikki left the store at 6:01 p.m, followed by Damon two minutes later. In a call that cell phone records showed began at 6:05 p.m., Nikki was talking with her father when she exclaimed that her rear window had just cracked and that she thought somebody was shooting at her; then she stopped talking, and the phone "made a bumping sound like she had dropped it." Nikki pulled over to the side of Highway 221 in Jeff Davis County, at a natural gas substation approximately one mile south of the Montgomery County line. While Nikki was still in her vehicle, she was shot twice in the head and neck at close range, causing her death.

Between 6:08 and 6:10 p.m., a motorist driving southbound on Highway 221 was just entering Jeff Davis County from Montgomery County when he saw a 1972 Chevrolet Chevelle with an unusual skull and crossbones front tag travelling northbound on Highway 221 at "at least" 80 to 90 miles per hour, with two adults in the front seat. As the motorist passed the substation south of the bridge, he saw a car with its dome light on and a leg sticking out of the open

driver's door, but assumed at the time that the driver was talking on the phone.

Damon initially told a GBI investigator that, at the meeting at the convenience store, Nikki fought with him over the children's medication and injured his hand, and he went into the convenience store to get ice for his hand. Then, he said, he and his mother drove straight to the Montgomery County Sheriff's Office to report that Nikki had assaulted him, while Nikki drove off in the opposite direction, toward Hazlehurst.[4] But while Damon was confined in the Jeff Davis County jail, he told another inmate, Don Ellis, that he and his mother had stopped to pick up the children at the store; that his wife had fussed at him, grabbed the diaper bag, and twisted his arm; that she left in her car and he and his mother pursued her, with his mother driving; that his wife "wouldn't pull over so he . . . shot at the car" and she then pulled over; that he walked up to the car and she was trying to crawl out the passenger side, so he shot

---

[4] The Bambergs went to the sheriff's office in Mount Vernon and filed a police report.

her; and that he and his mother then drove to the Montgomery County Sheriff's Office as fast as they could to file a police report claiming that Nikki had assaulted him in Uvalda.

After Sonya was arrested and confined in the Jeff Davis County jail, she became friendly with inmate Burtis Taylor, who was due to be released. Shortly before Taylor's release, Sonya drew a map and instructed Taylor to retrieve a pistol from Damon's brother, as well as some magazines and casings that had been hidden in a chicken pen behind her house in Mount Vernon, to conceal them on another person's property, and then to inform law enforcement so that the other person would be blamed for the murder.

Acting on the information that some gun parts were buried behind Sonya's house, investigators from the Jeff Davis County Sheriff's Office and the GBI searched the area and found several magazines and other gun parts consistent with a Hi-Point brand .45 ACP pistol, as well as a box of Winchester brand .45 ACP caliber cartridges and bullets. Ejected shells found at the scene of Nikki's death, ejected shells found approximately four tenths of a mile down

the road, and the bullet fragments retrieved from Nikki's body were all consistent with having been fired from a single, unknown Hi-Point .45 ACP pistol. Damon's brother testified that he received a .45 caliber Hi-Point pistol in exchange for doing repair work on a car, that Damon and Sonya were at his house on the day of the incident, and that he discovered the pistol was missing from his truck after Nikki's death. That pistol was never recovered.

(a) Damon challenges the sufficiency of the evidence to support his convictions, pointing to an apparent discrepancy between the timeline of events testified to by Jeff Davis County and GBI investigators and notations made in a handwritten log kept by a former Montgomery County Sheriff's Office dispatcher, whom the Bambergs called as a witness. Damon contends that because the evidence against him was "akin to" circumstantial evidence, the State therefore was required to exclude every reasonable hypothesis other than his guilt; and that as shown by the relevant times of entries in the handwritten log, he could not have committed the murder because the log showed that he was at the Montgomery

County Sheriff's Office at the time Nikki was killed. He surmises that Nikki must have been killed by an unknown assailant in a "road rage" incident.

Both former OCGA § 24-4-6 and OCGA § 24-14-6 provide: "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." Here, however, the State presented direct evidence of Damon's guilt, including his statement to a fellow inmate describing in detail how he killed Nikki. See *Goins v. State*, 306 Ga. 55, 56 (1) (829 SE2d 89) (2019) (evidence not wholly circumstantial when it included appellant's confession to former cellmate).

Moreover, to the extent that Damon's convictions did depend upon circumstantial evidence, "this evidence need not exclude every conceivable inference or hypothesis; it must rule out only those that are reasonable. And it is principally for the jury to determine whether an alternative hypothesis is reasonable." (Citations and punctuation omitted.) Id. Here, while the entries in the handwritten

log appear inconsistent with the timeline established by the testimony of witnesses from the Jeff Davis County Sheriff's Office and the GBI, the evidence presented at trial showed that the log contained numerous errors and omissions with respect to other events occurring on the night of the shooting and the timing of those events. For example, on cross-examination, the dispatcher acknowledged that "there was a lot of stuff going on . . . but it might not have all got recorded," and that if the times entered in his log were not consistent with those of the Jeff Davis County Sheriff's Office, they "would be incorrect." Moreover,

> it was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence. Likewise, it was for the jury to decide whether the defense theory that [an unknown assailant] was the killer was reasonable and not excluded by the other evidence. . . .

(Citations and punctuation omitted.) *Wilson v. State*, 295 Ga. 84, 85 (1) (b) (757 SE2d 825) (2014), disapproved on other grounds in *State v. Orr*, 305 Ga. 729, 735 n.5 (827 SE2d 892) (2019). Based upon this evidence, the jury was not required to find that Damon's hypothesis

was reasonable. We also note that the evidence was sufficient as a matter of constitutional due process to authorize a rational finder of fact to conclude beyond a reasonable doubt that Damon was guilty of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

(b) Sonya does not challenge the sufficiency of the evidence to support her convictions. However, as is this Court's practice in murder cases, we have reviewed the record to determine the legal sufficiency of the evidence. We conclude that the evidence presented at trial and summarized above was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Sonya was guilty of the crimes for which she was convicted. See *Jackson v. Virginia*, 443 U.S. at 319 (III) (B).

2. Both Damon and Sonya contend that the loss and subsequent reconstruction of the transcript of the first day of trial denied them their right to appeal. We conclude that the trial court followed the correct procedure for reconstructing the transcript under OCGA § 5-6-41 (f) and (g), and that the trial court's adoption

of the transcript created by that procedure has not deprived the Bambergs of their right to appeal.

The Bambergs' joint trial took place over four days in August and September 2009, and a total of 38 witnesses testified. After the filing of the Bambergs' initial motions for new trial, there was substantial delay in obtaining the transcript for various reasons, including continuances and two transfers of the case to new trial judges. After the transcript was delivered, the parties discovered that, due to an equipment malfunction, most of the first day's testimony had not been transcribed, and the Bambergs moved for a new trial on that basis. After the hearing on the motion for new trial was continued several times, and after an expert unsuccessfully attempted to recover data from the defective tapes, the State requested a hearing to reconstruct the missing testimony. The Bambergs objected and insisted upon a new trial.

On July 10, 2017, the trial court held a hearing and entered a detailed order setting out the procedure for reconstructing the record, relying upon OCGA § 5-6-41, *Mosley v. State*, 300 Ga. 521,

524-525 (2) (796 SE2d 684) (2017), and *Sheard v. State*, 300 Ga. 117 (793 SE2d 386) (2016). The relevant portion of that order provided:

> At the hearing, the State [m]ay subpoena and call all [f]ive witnesses from the first day of the trial. Additionally, the trial attorneys for both Defendants and the assistant district attorney who tried the case, and others present for the original trial, may be present in court to hear the testimony of the [f]ive witnesses and those individuals shall be called as witnesses after the [f]ive trial witnesses have testified to determine if they believe the testimony at the hearings was substantively the same testimony that was heard during the first day of the trial. After the [f]ive trial witnesses have testified and the trial counsel have testified as outlined above, this Court will determine if there is a dispute about whether the testimony is substantively the same testimony that was heard at the trial and [thereafter] rule on the State's Motion to Supplement the Record on Appeal.

The trial court also noted that "[t]he [f]ive witnesses whose testimony was lost, the judge who presided over the trial, the court reporter, and all trial attorneys are all alive and available to testify."[5]

---

[5] The Bambergs sought and received a certificate of immediate review for the order setting the hearing, but this Court denied their applications for interlocutory appeal. See Case Nos. S18I0006, S18I0009 (decided Sept. 5, 2017).

At the hearing, all five of the original witnesses from the first day of the trial appeared and testified.[6] In addition, one of the prosecutors from the original trial testified that the testimony of the five witnesses "was substantially the same as the testimony that was heard during the first day of trial." That prosecutor also testified regarding the admission of exhibits and the making of defense motions.[7] The Clerk of Superior Court, who was present at the trial, also testified and identified her contemporaneous notes recording the witnesses at trial in order of their appearance, including brief notes on their testimony, the admission of exhibits, and other events that occurred during trial. She affirmed that this

---

[6] The witnesses, in order of their appearance, were: (1) Gary Orvin, Nikki's father, who testified to his phone call with Nikki; (2) GBI agent Brian Hargett, who testified to tire and shoe impressions found at the scene and his inability to connect those impressions to Damon; (3) Jeff Davis County 911 dispatcher Sheryl Foskey, who testified to Orvin's 911 call and identified the recording; (4) Sheriff Preston Bohannon, a deputy at the time of the original trial, who testified that he responded to the call and found Nikki slumped in her vehicle, covered in blood; and (5) emergency medical technician Roger Ogilvie, who testified that he responded to the scene and confirmed that Nikki was dead. While the 911 call was identified on the first day of trial, it was played in redacted form for the jury during the transcribed portion of the original trial.

[7] The prosecutor testified at the hearing that the other attorney for the State had died.

was her normal routine and that she tried to "truly and accurately keep a record of . . . what goes on and put it in [her] notes."

Despite the detailed guidelines provided by the trial court's order, the Bambergs called no witnesses, and neither the Bambergs' trial counsel nor the original trial judge attended or testified. The Bambergs' new attorneys ("appellate counsel") very briefly cross-examined the State's witnesses but continued to insist that a new trial was the only remedy and that the State had the sole responsibility to perfect the record for appeal. The trial judge acknowledged that as a successor judge, he could have no recollection of the trial, but he found that the testimony at the hearing was substantively the same as that heard during the first day of trial and adequately supplemented the existing record. Relying upon *Mosley* and *Glass v. State*, 289 Ga. 542 (712 SE2d 851) (2011), the trial court held: "The transcript of the November 6, 2017 hearing having been filed; the Court hereby adopts this testimony and finds that the testimony supplementing the record was sufficient. The record is now complete."

The parties do not address the procedural requirements of reconstructing the record on appeal. The State relies primarily upon *Mosley*, which affirmed the preparation of a reconstructed record, while the Bambergs rely upon *Sheard*, which concluded that an attempted reconstruction was inadequate. But the loss of a portion of a trial transcript due to some accident or equipment malfunction is not unheard of, and, as shown by other decisions of this Court, the question of the adequacy of a given reconstruction is a fact-intensive analysis. After considering the facts presented here, we conclude that the State met its burden to produce a transcript pursuant to OCGA § 5-6-41 (f) and (g); that the trial court correctly approved the reconstructed transcript; and that the Bambergs, having refused the opportunity to contribute to the preparation of the reconstructed transcript, have not established that it is incomplete.

Subsections (f) and (g) of OCGA § 5-6-41 provide:

(f) Where any party contends that the transcript or record does not truly or fully disclose what transpired in the trial court and the parties are unable to agree thereon, the trial court shall set the matter down for a hearing with notice to both parties and resolve the difference so as

to make the record conform to the truth. If anything material to either party is omitted from the record on appeal or is misstated therein, the parties by stipulation, or the trial court, either before or after the record is transmitted to the appellate court, on a proper suggestion or of its own initiative, may direct that the omission or misstatement shall be corrected and, if necessary, that a supplemental record shall be certified and transmitted by the clerk of the trial court. The trial court or the appellate court may at any time order the clerk of the trial court to send up any original papers or exhibits in the case, to be returned after final disposition of the appeal.

(g) Where a trial is not reported as referred to in subsections (b) and (c) of this Code section or where for any other reason the transcript of the proceedings is not obtainable and a transcript of evidence and proceedings is prepared from recollection, the agreement of the parties thereto or their counsel, entered thereon, shall entitle such transcript to be filed as a part of the record in the same manner and with the same binding effect as a transcript filed by the court reporter as referred to in subsection (e) of this Code section. In case of the inability of the parties to agree as to the correctness of such transcript, the decision of the trial judge thereon shall be final and not subject to review; and, if the trial judge is unable to recall what transpired, the judge shall enter an order stating that fact.

These subsections, construed together, provide for the

reconstruction of a missing transcript of the proceedings whether or

not the parties agree as to the contents. And while "the correctness

of such transcript," as determined by the trial judge, is "final and

not subject to review," OCGA § 5-6-41 (g), whether the transcript is *complete* pursuant to OCGA § 5-6-41 (f) is reviewable on appeal. See *Johnson v. State*, 302 Ga. 188, 194 (3) (b) (805 SE2d 890) (2017) ("An appellant is entitled to a complete and correct transcript, one that discloses what transpired in the trial court not only truly but fully." (Citation and punctuation omitted.)).

In *Johnson*, all of the court reporter's materials and tapes were destroyed in a house fire, and the entire transcript of a six-day trial was lost. We observed that the procedure used in *Mosley*, "calling witnesses who testified or other individuals who were present for the trial," was an acceptable method of re-creating part of a lost trial transcript. 302 Ga. at 194 (3) (b). However, "[s]uch measures were not taken to re-create the transcript" in *Johnson*. Instead, the State apparently failed to interview and did not call any witnesses or observers, and appellant's counsel received no assistance from trial counsel, who died before the hearing. This "lackluster information-gathering process" produced only a brief narrative account of a six-day trial. 302 Ga. at 195 (3) (b). We concluded that because the entire

original trial transcript was lost and the attempt at reconstruction was "manifestly inadequate," a new trial was required. Id. at 198 (3) (c). See also *Sheard*, 300 Ga. at 119-120 (2) (holding that new trial required when no hearing was held to reconstruct missing transcript under OCGA § 5-6-41 (f) and (g), and trial court denied motion for new trial based on its standard practices and recollection 15 years after trial). Here, by contrast, only one day's testimony from a four-day trial was reconstructed by use of the procedures outlined in OCGA § 5-6-41 (f) and (g), as opposed to "creating a trial transcript from scratch" as unsuccessfully attempted in *Johnson*. See 302 Ga. at 193 (3) (a) n.7. See also *Mosley*, 300 Ga. at 521 n.1 (affirming conviction when transcript of one day of three-day trial reconstructed, using a similar method to that employed here).

Here, in accordance with OCGA § 5-6-41 (f) and (g) and the trial court's detailed order, the State presented testimony from all five original trial witnesses whose testimony had been lost, and, in an effort to verify their testimony, called the Clerk of Court and the only living prosecuting attorney. See *Mosley*, 300 Ga. at 524 (2)

(affirming convictions when only three of four original witnesses testified at hearing to reconstruct record). And while the reconstructed testimony was relevant to the case, it essentially "set the scene" for the jury and recounted the facts surrounding the victim's death, without specifically implicating the Bambergs. Some of the reconstructed testimony was exculpatory, as one witness testified that footprints and tire impressions on the scene could *not* be connected with the Bambergs. Compare *Sheard*, 300 Ga. at 119-120 (2) (holding that new trial required when missing portions of transcript included closing arguments, questions from the jury, and the entire charge of the court, which we described as "a crucial portion of trial").

In addition to testimony from all of the fact witnesses from the original trial, one of the original prosecutors confirmed that the witnesses testified consistently with their original trial testimony. Finally, the Clerk of Court identified her contemporaneous notes of the witnesses and their testimony as originally given at the trial. See, e.g., *Leeks v. State*, 296 Ga. 515, 517 (2) (769 SE2d 296) (2015).

The trial court then made a factual finding as to whether the record "conform[ed] to the truth." OCGA § 5-6-41 (f).[8] We conclude that this presentation was adequate to support the trial court's reconstruction of the first day of trial.

The Bambergs only reluctantly and minimally participated in the reconstruction of the record. They did not present testimony from their trial counsel or the original trial judge, by affidavit or otherwise; they called no witnesses, and appellate counsels' participation was minimal, limited to brief cross-examinations of the witnesses presented by the State. As the hearing began, the trial court asked the Bambergs' appellate counsel who would be present to observe on the Bambergs' behalf and to testify whether the witnesses' new testimony was consistent with their trial testimony, in accordance with the trial court's order. Appellate counsel

[8] Our decisions make clear that when the original trial judge is no longer presiding over the case, "the [current] trial court rather than the [original] trial judge [is] the proper judicial figure to supplement the certified trial transcript to reflect the truth of what occurred in the trial." *State v. Nejad*, 286 Ga. 695, 700 (1) (690 SE2d 846) (2010). See also *Leeks*, 296 Ga. at 519 (2) n.4 ("We note that it makes no difference that Judge Manis held the hearing on the State's motion to supplement the record and granted the motion, rather than Judge Glanville who presided over Appellant's trial.").

responded that it was the State's responsibility to perfect the record and that they were not prepared to participate.

On appeal, the Bambergs continue to insist that they had no obligation to participate and no burden to meet in the process of reconstructing the record, and that the transcript is still incomplete, as it does not include any objections, bench conferences, or rulings that may have occurred. Their contention that they may decline to participate without consequence, however, is incorrect. In *Glass*, this Court observed:

> OCGA § 17-8-5 (a) requires the trial judge to ensure that the testimony in all felony trials is taken down. This code section clearly states that, in the event of a felony conviction, it is the duty of the state, at its own expense and through the agency of the presiding judge, to request the court reporter to transcribe the reported testimony. . . .
>
> However, . . . the State's duty to request the court reporter to transcribe the reported testimony in a felony conviction has no time limit and thus cannot relieve an appellant from a felony conviction of his statutory duty to cause the transcript to be prepared and filed as provided by Code Section 5-6-41. . . . Thus, where the transcript does not fully disclose what transpired in the trial court, the burden is on the complaining party to have the record completed pursuant to OCGA § 5-6-41.

(Citations and punctuation omitted.) 289 Ga. at 545 (2). See also *Nejad*, 286 Ga. at 698 (1) ("It is true that the burden is on the party which contends the transcript does not fully disclose what transpired at trial to have the record completed at the trial court pursuant to OCGA § 5-6-41 (f)." (Citation omitted)). In *Johnson*, we observed, citing *Glass* and *Nejad*, that "[o]nce the State has satisfied its obligation [to provide a transcript] under OCGA §§ 17-8-5 (a) and 5-6-41 (a) . . . if the defendant believes the transcript omits or misrepresents a necessary part of the proceeding, he has the responsibility to seek to correct the transcript in that respect." 302 Ga. at 193 (3) (a) n.7. See also *Glass*, 289 Ga. at 546 (3) ("The law does not permit [defendant-appellant], who as the complaining party has the burden of having the record completed under OCGA § 5-6-41 (f), (g), simply to refuse to participate in the statutory procedure and then claim error." (Citations and punctuation omitted.)).

Once the State provided the testimony of all the original

witnesses, and evidence was presented that the witnesses' testimony was consistent with their testimony at trial, the Bambergs had an obligation to provide evidence in support of their contention that the record was still incomplete, and to raise specific objections rather than merely speculate about possible omissions in the reconstructed testimony. See *Gadson*, 303 Ga. at 878 (3) (a) ("[W]here . . . an otherwise verbatim transcript is missing only one or a few parts of the trial, the appellant is not entitled to a new trial unless he alleges that he has been harmed by some specified error involving the omitted part and shows that the omission prevents proper appellate review of that error.").[9]

---

[9] Sonya's contention that trial counsel could not be expected to assist appellate counsel because "trial counsel cannot be made to assert his own ineffectiveness" is without merit. Trial counsel would have been aiding in the reconstruction of the transcript, not using the transcript to demonstrate any error. Moreover, Sonya's appellate counsel called her trial counsel at the hearing on her motion for new trial, and she and Damon's appellate counsel questioned Sonya's trial counsel extensively about matters occurring during the trial, as has been done in numerous appeals before this Court in which appellants contended that they received ineffective assistance of trial counsel. Moreover, in many of this Court's prior decisions on a reconstructed record, a defendant's trial counsel testified as part of the efforts at reconstruction, whether by affidavit or at a hearing held for that purpose. See, e.g., *Mosley*, 300 Ga. at 524 (2); *Leeks*, 296 Ga. at 517 (2); *Nejad*, 286 Ga. at 695-696 (1).

The Bambergs failed to avail themselves of the opportunity to participate in reconstruction of the trial testimony, and therefore did not establish any error with regard to the reconstructed transcript. This remains true even if the transcript theoretically could have been made more certain, or if any portion of it could have been undermined by testimony from other participants or observers.

3. Next, the Bambergs assert that the trial court erred in declining to reopen the evidence on their motions for new trial. "It is well settled that the decision to reopen evidence is a matter that rests within the sound discretion of the trial court." (Citations omitted.) *Walton v. State*, 303 Ga. 11, 16 (4) (810 SE2d 134) (2018); see also *Danenberg v. State*, 291 Ga. 439, 443 (5) (729 SE2d 315) (2012).

After the hearing on the Bambergs' motions for new trial, their appellate counsel filed motions to reopen the evidence. In Damon's motion, his appellate counsel declared that appellate counsel "decided to watch some of the news stories about the case just for entertainment purposes" and was "shocked" to discover a television

show dramatizing his client's case, which, he alleged, included exculpatory evidence. Damon's appellate counsel attached to the motion an unverified document that appellate counsel described as a partial "transcription" of the show, purporting to show statements by a narrator, actors, including an actor playing jail inmate Burtis Taylor, and portions of an alleged interview with Taylor. Counsel contended that this "transcription" shows that Taylor was acting as a government agent and was assigned by prosecutors to extract incriminating statements from the Bambergs. Taylor, however, testified at trial that his conversations, primarily with Sonya, took place as a result of his duties as a jail trustee. He testified specifically that he was never asked by investigators or by the prosecutor to obtain evidence from either of the Bambergs, that neither the police nor the prosecutor made any promises to him or gave him any hope of benefit, and that the State made no agreement or deal with him regarding the charges he was facing at the time of

his incarceration.[10]

In little more than a single page of argument, Damon asserts that the "transcription" shows that the State violated *Massiah v. United States*, 377 U. S. 201 (84 SCt 1199, 12 LE2d 246) (1964), *Bruton v. United States*, 391 U. S. 123 (88 SCt 1620, 20 LE2d 476) (1968), *Brady v. Maryland*, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963), *Giglio v. United States*, 405 U. S. 150 (92 SCt 763, 31 LE2d 104) (1972), *Napue v. Illinois*, 360 U. S. 264 (79 SCt 1173, 3 LE2d 1217) (1959), and *Smith v. Zant*, 250 Ga. 645 (301 SE2d 32) (1983). Sonya, in a somewhat lengthier argument, contends that the "transcription" establishes a "prima facie case" that the witness was acting on behalf of the government to elicit a confession from Sonya in violation of *Massiah*, and that the State might have failed to disclose this agency in violation of *Brady* and *Giglio*.

But we need not consider those questions, because the

---

[10] On cross-examination, Taylor acknowledged that he had been a paid confidential informant in the past, had assisted police "probably four or five times total," and had served as a jail trustee. He also acknowledged certified copies of his numerous criminal convictions.

Bambergs have provided no potentially admissible evidence that Taylor's testimony at trial was false or that he acted at the direction of the State in conversing with the Bambergs. The unverified partial "transcription" of a television show, of uncertain provenance, purportedly containing an interview with a witness, employing actors, and fictionalized to an unknown degree, is rank hearsay and has little if any probative value. Accordingly, the trial court did not abuse its discretion in declining to reopen the evidence.

4. Citing *Crawford v. Washington*, 541 U. S. 36 (124 SCt 1354, 158 LE2d 177) (2004), and *Bruton v. United States*, 391 U. S. 123 (88 SCt 1620, 20 LE2d 476) (1968), Damon asserts that the admission of Burtis Taylor's testimony that Sonya told Taylor that "she was in the vehicle when Damon actually done the shooting" violated his right to confrontation. However, when Taylor testified to Sonya's statement at trial, which took place in 2009 under the former Evidence Code, Damon did not object. Damon therefore failed to preserve this claim for review. See *Grissom v. State*, 296 Ga. 406, 411 (2) (768 SE2d 494) (2015). Cf. *McKinney v. State*, 307 Ga. 129,

133 (2) n.3 (834 SE2d 741) (2019) (holding that under new Evidence Code, failure to make Confrontation Clause objection at trial precludes ordinary appellate review, but plain error review is available).

5. Sonya lists nine different statements or rulings made by the trial court during trial and contends, for the first time on appeal, that these comments, taken as a whole, "could have been construed by the jury as an expression of opinion on the evidence and on the credibility of the State's witnesses, as well as a comment on the credibility of the defense witnesses." Citing only a single decision of the Georgia Court of Appeals applying former OCGA § 17-8-57, *Haymer v. State*, 323 Ga. App. 874 (747 SE2d 512) (2013), she contends that her convictions and sentences "must be reversed."

However, in relying upon *Haymer*, Sonya has overlooked the 2015 amendment to OCGA § 17-8-57 and our holding in *Willis v. State*, 304 Ga. 122, 129 (2) (b) (816 SE2d 656) (2018), that this Code section, as amended in 2015, applies to appeals decided after 2015. Former OCGA § 17-8-57 provided that the expression of an opinion

by a trial judge in a criminal case "as to what has or has not been proved . . . [s]hall be held by the Supreme Court or Court of Appeals to be error and the decision in the case reversed, and a new trial granted." In contrast, the revised Code section declares that any party alleging that a trial judge has expressed an opinion to the jury as to whether a fact has or has not been proved "shall make a timely objection and inform the court of the specific objection and the grounds for such objection, outside of the jury's hearing and presence." OCGA § 17-8-57 (a) (2). Moreover, "failure to make a timely objection . . . shall preclude appellate review, unless such violation constitutes plain error which affects substantive rights of the parties." OCGA § 17-8-57 (b).

Here, Sonya failed to object at trial to any of the statements now complained of, so a plain error analysis applies.

> To establish plain error, Appellant must point to a legal error that was not affirmatively waived, was clear and obvious beyond reasonable dispute, affected his substantial rights, and seriously affected the fairness, integrity, or public reputation of judicial proceedings.

*Hightower v. State*, 304 Ga. 755, 759 (2) (b) (822 SE2d 273) (2018).

See also *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011).

Sonya's brief simply asserts that the individual statements or rulings by the trial court violated former OCGA § 17-8-57.[11] We have reviewed each statement and ruling complained of, however, and we conclude that Sonya has failed to show that the trial judge "express[ed] or intimate[d] to the jury the judge's opinion as to whether a fact at issue has or has not been proved." OCGA § 17-8-57 (a) (1).[12] The instances complained of involve the trial court's intervention to prevent witnesses from giving an impermissible opinion or testifying without a proper foundation being laid; the trial court's questions to witnesses to clarify testimony; and the trial court's intervention to caution counsel not to assume facts not in evidence or disparage a witness.

---

[11] We have observed that, while an appellant need not specifically "cast[ ] the alleged infirmity as 'plain error,' parties should be advised that the hurdle to establishing plain error is high . . . and therefore that the failure to specifically articulate how the alleged error satisfies this high standard increases the likelihood that their claims in this regard will be rejected." *Kelly*, 290 Ga. at 32 (1) n.2.

[12] One instance cited by Sonya occurred outside the presence of the jury, and "[t]he prohibitions found in OCGA § 17-8-57 do not apply when the complained of comments are made outside the presence of the jury." *Rhodes v. State*, 296 Ga. 418, 421 (2) (c) (768 SE2d 445) (2015).

It is well established that

> a trial judge may propound questions to a witness to develop the truth of the case, to clarify testimony, to comment on pertinent evidentiary rules and to exercise its discretion when controlling the conduct of counsel or witnesses in order to enforce its duty to ensure a fair trial to both sides.

(Citation and punctuation omitted.) *Benton v. State*, 301 Ga. 100, 102 (3) (799 SE2d 743) (2017). "[A]nd the extent of such an examination is a matter for the trial court's discretion." (Citation omitted.) *Finley v. State*, 286 Ga. 47, 51 (9) (a) (685 SE2d 258) (2009). Sonya has failed to demonstrate that the specified statements and rulings constituted errors that were "clear and obvious beyond reasonable dispute." She therefore has failed to demonstrate plain error.[13]

*Judgments affirmed. All the Justices concur.*

---

[13] If one prong of the plain error test is not satisfied, we need not address the other prongs of the test. See *Kelly*, 290 Ga at 34 (2) (b) n.5.

DECIDED FEBRUARY 28, 2020
– RECONSIDERATION DENIED MARCH 25, 2020.
Murder. Jeff Davis Superior Court. Before Judge Guy.
*Rodney S. Zell*, for appellant (case no. S19A1052).
*Clare L. Nolan*, for appellant (case no. S19A1054).
*Jacquelyn L. Johnson, District Attorney, Andrew J. Ekonomou, Thomas E. Buscemi, Jan Kennedy, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Mark S. Lindemann, Assistant Attorney General*, for appellee.