309 Ga. 705
FINAL COPY

S20A0717.  CROSS v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Brandon Cross was convicted in 2003 of malice murder and other crimes in connection with the death of Debra Hymer. On appeal, he contends that the trial court erred by declining to allow him to impeach the hearsay statements of his co-conspirator Jessica Cates, by failing to charge the jury as to the burden of proof for co-conspirator statements, and by admitting three autopsy photographs and a video recording of the crime scene. He also argues that he should be granted a new trial because the record is insufficiently complete. As explained below, we affirm.[1]

---

[1] The crimes occurred on January 26, 2002. On July 31, 2002, a Hall County grand jury indicted Appellant and Cates for malice murder, two counts of felony murder, aggravated assault, burglary, and concealing the death of Hymer; Cates was also charged with making false statements. Cates pled guilty to conspiracy to commit murder and other crimes. Appellant was then tried alone from March 10 to 17, 2003; the jury found him guilty of all counts. In April 2003, the trial court sentenced Appellant to serve life in prison for malice murder and consecutive terms of 20 years each for burglary and concealing Hymer's death. The court purported to merge the felony murder

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. In early January 2002, Appellant, who was 18 years old, lived in Hymer's house in Hall County with Hymer and 18-year-old Cates, whom Appellant was dating.[2] About three weeks before Hymer was killed, Appellant got into an argument with her, and she told Appellant to move out. Appellant moved out but would return to the house when Hymer was not there.

On the night of January 26, Junior Adams, who did not know Hymer, was driving on a highway near Lula, Georgia, when he saw her standing on the shoulder of the highway crying. Adams stopped to ask if she needed help; Hymer asked him to give her a ride home, and he agreed. Hymer then asked Adams to come inside her house to help build a fire in her wood stove, and he agreed. When they got

counts into the malice murder conviction, but those counts were actually vacated by operation of law, see *Johnson v. State*, 292 Ga. 22, 24 (733 SE2d 736) (2012); the aggravated assault count merged. The lengthy post-trial proceedings in Appellant's case are detailed in Division 5 (a) below. His current appeal was docketed in this Court to the April 2020 term and submitted for a decision on the briefs.

[2] Two witnesses testified that Cates called Hymer "mom," but Appellant has advised that Cates and Hymer were not related by blood.

inside, Cates came out of her bedroom and started arguing with Hymer. Cates was wearing pajama pants with a drawstring. During the argument, Cates received a phone call and then asked Adams if he would take her to pick up a friend at a restaurant in Gainesville; he agreed. As he was leaving with Cates, Hymer called her a "b*tch" and a "sl*t," and said, "Don't come back. You are not welcome here anymore." When Cates and Adams arrived at the restaurant, her friend was not there, so Adams drove Cates back home, dropped her off at the end of the driveway, and left around midnight.

Three days later, on January 29, Cates called her best friend Kay Ivester. Cates was crying and upset, and she told Ivester that Appellant had left to go to Michigan.[3] Cates then told Ivester the following. On the night of January 26, when Cates returned home from the Gainesville restaurant, Hymer had locked her and Appellant outside, where it was raining and cold. Appellant said,

---

[3] It appears from the record that Appellant was arrested on unrelated charges and extradited to Michigan, where he was booked into jail and made the calls discussed below, but evidence of those proceedings was not presented to the jury.

"[W]ell, we have got to do something about it." Cates and Appellant then went inside and got into a fight with Hymer, and Appellant strangled Hymer and beat her head into the floor, killing her. Cates cleaned up Hymer's blood, burned her clothes, and helped dispose of her body on the property.

A few days later, Cates called Ivester again and told her that Hymer had been found and that she was joking about what she told Ivester before. When Ivester later learned that Hymer had not actually been found, she placed an anonymous phone call to the Hall County Sheriff's Office and relayed to an officer what Cates told her about Hymer's killing, which led to an investigation.

While Appellant was in Michigan, he and Cates had a series of phone conversations, audio recordings of which were played for the jury at his trial, in which they discussed their belief that Ivester placed the anonymous phone call to the investigators, and Appellant said that Ivester had reported most of the details about Hymer's killing correctly. They also discussed a false alibi for Appellant that Cates had given to the investigators. In one call, Cates said that

investigators had been at Hymer's house but left; Appellant replied, "I was about to start part two of this killing spree." In another call, Cates told Appellant that investigators were searching the property, and Appellant said, "I don't think they're gonna go way back there, and they're gonna start walking, and they're gonna be like f**k this. . . . That's a lot of acreage."

On February 6, eleven days after Hymer was killed, investigators searched her house and the surrounding property. In the house, they found Hymer's empty purse in a cabinet beside the wood stove. On the property, they found among other things a broken wheelbarrow and a mop. There were blood stains on the carpet in Hymer's living room, and the mop later tested positive for the presence of blood. On February 8, investigators found Hymer's body covered with dirt, leaves, and sticks in a mineshaft opening in the woods behind her house. The medical examiner who performed Hymer's autopsy on Feburary 9 said that she died either from strangulation or blunt force head trauma. Her head had been struck so hard that she had bled into her sinus cavities.

Appellant was interviewed by the Hall County investigators in Michigan on February 8 and 9. The interviews were audio recorded and played for the jury at trial. After initially blaming Hymer's husband for her death, Appellant gave the following account of the night of her killing. Appellant and Cates were sitting in her bedroom when he saw a car pull into the driveway, so he jumped out a window and hid in the woods behind the house. Sometime later, after he had moved to an outbuilding closer to the house, he saw Cates walking up the driveway alone, so he whistled at her to get her attention. Cates went into the outbuilding, told Appellant about the argument that she had with Hymer, and said, "You're gonna have to kill her, that's the only thing we can do. It's either that or just stand out here and freeze, . . . either her or us." Appellant ultimately agreed, and he and Cates decided that he would use the drawstring on Cates's pajama pants to strangle Hymer.

Appellant and Cates walked up to the house. Cates knocked on the front door, which Hymer opened, and Cates walked inside and began to argue with her. Appellant, who was not initially visible to

Hymer, then walked into the house; Hymer looked at him and said, "Get the f**k out of my house." Cates said, "Do it," and Appellant strangled Hymer to death with the drawstring while Cates watched and smoked a cigarette. When Appellant let go of the string, Hymer fell and hit her head on the floor, and her head started bleeding, but Appellant claimed that he did not bash her head on the floor or otherwise strike her.

Appellant and Cates then wrapped Hymer in a sheet, carried her body outside, and placed her in a wheelbarrow. Appellant tried to roll the wheelbarrow into the woods, but it was broken, so he pulled Hymer's body out and threw the wheelbarrow down an embankment. Appellant and Cates then dragged the body to a trail in the woods behind the house and left her there; while they were dragging Hymer, her shirt came off.

Appellant and Cates returned to the house, and Cates emptied Hymer's purse and burned the contents, along with Hymer's shirt and the sheet in which they had wrapped her body, in the wood stove. Appellant and Cates went back outside and continued

dragging Hymer's body to the opening of an abandoned mineshaft. Appellant threw the body into the opening and covered Hymer with dirt, leaves, and sticks. Appellant and Cates then walked back to the house, where Cates cleaned up Hymer's blood using a mop. The next day, Appellant and Cates went back to Hymer's burial site and added more dirt, leaves, and sticks over her body.

During the interviews, Appellant accurately described the items the investigators found at the crime scene, and he drew a diagram of the property showing where he and Cates had disposed of the items that matched what the investigators had found. Investigators also seized the shoes that Appellant was wearing on the night of Hymer's killing; blood on the shoes was later identified as Hymer's.

Appellant does not dispute the legal sufficiency of the evidence supporting his convictions. Nevertheless, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant

guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).[4]

2. Appellant first contends that the trial court abused its discretion by declining to allow him to impeach Cates's hearsay statements to Ivester with other, inconsistent hearsay statements that she later made to an investigator and with the plea bargain that she later made with the State. At trial, Appellant argued that Cates's statements to the investigator were admissible as co-conspirator statements under former OCGA § 24-3-5,[5] and he asked

---

[4] We remind litigants that this Court will end its practice of considering the sufficiency of the evidence sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, 309 Ga. 385, 399 (846 SE2d 83) (2020). This Court began assigning cases to the December Term on August 3, 2020.

[5] Appellant's trial was held in 2003, long before the current Evidence Code took effect in 2013. Former OCGA § 24-3-5 said, "After the fact of conspiracy is proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all."

the court if her plea bargain could be used to impeach her if she testified. The trial court ruled that the statements were not admissible under OCGA § 24-3-5, and Cates invoked her right against self-incrimination, so she did not testify. Appellant never argued at trial that Cates's statements to the investigator or her plea bargain should be admitted to impeach her hearsay statements to Ivester, and thus the trial court did not rule on the admissibility of the statements or the plea bargain for that purpose.

Under the old Evidence Code, to preserve for any sort of review on appeal a claim that the trial court improperly excluded hearsay evidence under a particular theory, a defendant had to argue at trial that the evidence was admissible under that theory. See *Brown v. State*, 295 Ga. 804, 814 (764 SE2d 376) (2014); *Bridges v. State*, 263 Ga. App. 849, 850 (589 SE2d 616) (2003). Compare OCGA § 24-1-103 (d) (providing for plain error review of unpreserved evidentiary objections under the current Evidence Code). Under the old Evidence Code (and the current Code), the prior inconsistent statements of a testifying witness were admissible as *both*

substantive and impeachment evidence, but prior inconsistent statements of a hearsay declarant who did *not* testify were "'limited in value only to impeachment purposes'" and warranted "a limiting instruction to the jury on that restrictive use." *Esprit v. State*, 305 Ga. 429, 437 (826 SE2d 7) (2019) (citation and punctuation omitted).

Appellant argued at trial that Cates's statements to the investigator were admissible under the co-conspirator hearsay exception (which would have allowed the jury to consider them as substantive evidence), but he does not pursue that argument on appeal. Appellant never argued at trial that the statements at issue were admissible to impeach Cates's hearsay statements to Ivester (which would have allowed the jury to consider them only to impeach Cates as a hearsay declarant), nor did Appellant argue that Cates's plea bargain was admissible to impeach her statements to Ivester. Accordingly, Appellant forfeited review of this claim. See *Brown*, 295 Ga. at 814.

3. Appellant next contends that the trial court erred by failing to instruct the jury as to the burden of proof for its consideration of

co-conspirator hearsay statements after the court admitted Cates's statements to Ivester. However, Appellant did not object at trial to the court not charging the jury on this point, and he therefore forfeited this claim too. See *Norman v. State*, 303 Ga. 635, 641 & n.4 (814 SE2d 401) (2018) (explaining that this Court does not conduct even plain error review of jury instruction claims that were not properly raised at trial when the trial occurred before the July 1, 2007 effective date of OCGA § 17-8-58 (b)).[6]

4. Appellant contends that the trial court abused its discretion by admitting three post-incision autopsy photographs and a video recording of the crime scene.[7] We disagree.

---

[6] In his reply brief, Appellant argues that his trial counsel's failure to preserve this claim constitutes ineffective assistance of counsel. But where a claim of ineffective assistance of trial counsel was not raised at the earliest practicable moment, it is not preserved for appellate review. See *Elkins v. State*, 306 Ga. 351, 361 (830 SE2d 217) (2019). Appellant's initial motion for new trial raised only the general grounds. With new counsel, Appellant filed an amended motion raising several ineffective assistance claims, but not a claim that his trial counsel was ineffective for not objecting to the co-conspirator hearsay instruction. Appellant's new counsel did not argue such a claim at the hearing on the motion, and the trial court summarily denied the motion for new trial. Accordingly, this belated claim of ineffective assistance of trial counsel was waived. See id. at 362.

[7] In his principal brief, Appellant argued that other, pre-incision autopsy

(a) Before the medical examiner testified at Appellant's trial, the court heard a proffer from him regarding a number of autopsy photos of Hymer's body, including three that were taken post-incision. The medical examiner testified that those three photos showed Hymer's internal head and neck injuries, would be helpful in explaining her injuries to the jury, and were necessary to show the extent of her internal injuries because the decomposition of her body obscured injuries that might otherwise have been visible externally. The prosecutor also pointed out that the photos tended to disprove Appellant's claim that he did not injure Hymer's head. The trial court ruled that the autopsy photos were admissible, and they were then admitted into evidence during the medical examiner's testimony to the jury.

Under the old Evidence Code, post-incision autopsy photos were admissible when "necessary to show some material fact which becomes apparent only because of the autopsy." *Brown v. State*, 250

photos were also erroneously admitted, but in his reply brief he concedes that those photos were properly admitted.

Ga. 862, 867 (302 SE2d 347) (1983).[8] The medical examiner explained that the three photos at issue showed the extent of internal head and neck injuries that Hymer suffered that were not apparent but for the autopsy. Accordingly, the trial court did not abuse its discretion in admitting the photos. See, e.g., *Spears v. State*, 296 Ga. 598, 612-613 (769 SE2d 337) (2015); *Bunnell v. State*, 292 Ga. 253, 258 (735 SE2d 281) (2013).

(b) The jury was also shown a large number of photographs depicting Hymer's home, the trail leading to where her body was hidden, the burial site itself, and the state of her body when it was discovered by investigators. Later, the State sought to admit a video recording made after Hymer's body was found. The first part of the video showed Hymer's burial site and her body in the condition that it was discovered. The second part of the video, which was recorded on the following day, showed Hymer's home, the locations of the

---

[8] In *Venturino v. State*, 306 Ga. 391, 395-396 (830 SE2d 110) (2019), we held that *Brown*'s judge-made exclusionary rule was abrogated by the current Evidence Code.

various items of evidence collected by investigators, and the trail leading from the house to the burial site.[9] Appellant's counsel objected, arguing that the recording was cumulative of the many crime scene photographs already admitted into evidence without objection and prejudicial because the videographer "zooms in, zooms out several times," and the video includes gruesome images of Hymer at her burial site. The trial court overruled the objection, and the video recording was then played for the jury.

This Court repeatedly held under the old Evidence Code that "[p]hotographs showing the condition and location of the victim's body are admissible where alterations to the body are due to the combined forces of the murderer and the elements." *Klinect v. State*, 269 Ga. 570, 574 (501 SE2d 810) (1998). See also *Cohen v. State*, 275 Ga. 528, 530 (570 SE2d 301) (2002) (involving a crime scene video). That is what the first part of the video showed: Hymer's dead body

---

[9] The video is not in the record. However, the lead investigator described the video while it was being played for the jury. And as explained below in Division 5, the trial court concluded that a number of photos that are part of the record are representative of what was depicted in the video.

as it was discovered by the investigators over two weeks after Appellant and Cates concealed it. The second part of the video showed the interior and exterior of Hymer's house, along with the location of various items of evidence relative to the house and to Hymer's body. See *Wellons v. State*, 266 Ga. 77, 90 (463 SE2d 868) (1995) (holding that a crime scene video was admissible where it was "relevant to show the location of the body in relation to various evidence and to the scene of the murder, the extent to which [defendant] had concealed the body from view, and the relationship of various items of evidence"). The trial court did not abuse its discretion by admitting the video, even though it was duplicative of the photographic evidence. See id.; *Foster v. State*, 258 Ga. 736, 740 (374 SE2d 188) (1988) (rejecting the argument that the trial court abused its discretion by admitting a videotape of the crime scene including the interior and exterior of the victim's home, the path the defendant took to the house, and the victim's body, even though the video was duplicative of photographs also admitted into evidence).

5. Finally, Appellant argues that the record is not sufficiently

complete for this Court to review his convictions because trial exhibits went missing and because he was not given the opportunity to present to the trial court an affidavit from Cates's cellmate claiming that, after Appellant's convictions, Cates confessed that he had nothing to do with Hymer's murder.

(a) Appellant was sentenced in April 2003. He then filed a timely motion for new trial, which was denied by the trial court on February 2, 2005. On March 2, 2005, Appellant filed a motion for reconsideration and requested an extension of time to file a notice of appeal. He attached to the motion an affidavit from Cates's cellmate, also dated March 2, claiming that after his trial, Cates confessed to the cellmate that she strangled Hymer with pajama strings, beat her with brass knuckles, and bashed her head on the floor, and that Appellant did not participate in the killing. Two days after filing the motion, and before the trial court ruled on it, Appellant filed a notice of appeal, but his counsel asked the trial court clerk by letter not to transmit the record to this Court. Five days later, the trial court denied the motion as moot. Over 13 years passed until September

2018, when Appellant's current counsel requested that the record be transmitted.[10]

Appellant's case was finally docketed in this Court in August 2019. However, at some point during the more than 16 years between his trial and his appeal reaching this Court, some trial exhibits went missing — namely, the video recording of Hymer's body and the crime scene and the original audio recordings of Appellant's phone calls with Cates and interviews with the investigators. Appellant filed a motion in this Court asking that his case be remanded to the trial court to "examine the performance of his trial [counsel], seek admission of newly discovered evidence, and seek a ruling as to . . . reconstructing missing parts of the trial record." In September 2019, this Court issued an order striking Appellant's case from the docket and remanding the case to the trial

_____

[10] In July 2012, seven years after the notice of appeal was filed, Appellant himself wrote a letter to the trial court saying that he had been unable to contact his appellate counsel and asking the court to appoint new counsel. There appears to have been no response. More than five years later, in February 2018, Appellant filed a motion asking for information about the status of his appeal and why he had not been appointed new counsel. Appellant was finally appointed new counsel — his current counsel — in August 2018.

court "for the limited purpose of completing the record," directing the trial court "to hold a hearing to address Appellant's claims regarding the incompleteness of the record and to take whatever actions may be necessary in this regard."

On remand, the trial court held a record-reconstruction hearing, which was presided over by the same judge who presided over Appellant's trial; one of the prosecutors from the trial represented the State at the hearing. The prosecutor tendered transcripts of the complete calls between Appellant and Cates, which he represented were accurate from his recollection, and CD recordings of the portions of the calls that were played for the jury at trial. The prosecutor also tendered complete CD recordings and microcassette recordings of Appellant's interviews with the investigators, along with transcripts of the interviews. As to the missing video recording, the prosecutor tendered 76 photographs that were admitted at trial, and he represented that the photos accurately showed what was on the video, noting that Appellant's trial counsel had argued during the trial that the video was

cumulative of the photos. Appellant's current counsel noted that the transcripts were not official and that none of the investigators or other attorneys involved in the trial were called as witnesses, but he did not object to the substitutions or offer any evidence suggesting that the reconstructed exhibits were inaccurate or incomplete. The trial court ruled that it would admit the substitute exhibits and issue an order regarding whether they completed the record. There was no mention during the hearing of Cates's cellmate or her affidavit.[11]

In October 2019, the trial court entered an order ruling that the State's substitutions for the recordings of Appellant's interviews and phone calls "are representative of these missing exhibits . . . [and] were admitted as substitutes for original missing exhibits without objection." As to the video recording, the court ruled that "the State has represented and the [c]ourt through testimony at trial

---

[11] According to Appellant's brief, at a non-transcribed calendar call for the record-reconstruction hearing, the trial court denied his request to call witnesses, including Cates's cellmate, regarding the cellmate's affidavit and trial counsel's performance.

finds that [the photos admitted at the record-reconstruction hearing] are still photographs of the scene which essentially represent in still form the missing video." The trial court therefore concluded that the "record is now as complete as possible for appellate review."

(b) The trial court complied with the record-reconstruction requirements of OCGA § 5-6-41 (f) and (g).[12] The judge who presided over Appellant's trial presided over the record-reconstruction

---

[12] OCGA § 5-6-41 says in pertinent part:

. . .

(f) Where any party contends that the transcript or record does not truly or fully disclose what transpired in the trial court and the parties are unable to agree thereon, the trial court shall set the matter down for a hearing with notice to both parties and resolve the difference so as to make the record conform to the truth.

. . .

(g) Where a trial is not reported as referred to in subsections (b) and (c) of this Code section or where for any other reason the transcript of the proceedings is not obtainable and a transcript of evidence and proceedings is prepared from recollection, the agreement of the parties thereto or their counsel, entered thereon, shall entitle such transcript to be filed as a part of the record in the same manner and with the same binding effect as a transcript filed by the court reporter as referred to in subsection (e) of this Code section. In case of the inability of the parties to agree as to the correctness of such transcript, the decision of the trial judge thereon shall be final and not subject to review; and, if the trial judge is unable to recall what transpired, the judge shall enter an order stating that fact.

hearing, and the prosecutor from his trial represented at the hearing that the admitted substitute exhibits accurately reflected the missing trial exhibits, without objection or presentation of conflicting evidence by Appellant. See *Bamberg v. State*, 308 Ga. 340, 345, 348 (839 SE2d 640) (2020); *Mosley v. State*, 300 Ga. 521, 524 (796 SE2d 684) (2017). We conclude that the record is sufficiently complete for appellate review. See *Bamberg*, 308 Ga. at 348.

As for the affidavit of Cates's cellmate, the trial court did not consider that document in March 2005 because Appellant filed a notice of appeal before the court addressed the motion for reconsideration to which the affidavit was attached. See *Moon v. State*, 288 Ga. 508, 517 (705 SE2d 649) (2011) (explaining that the appellant's filing of a notice of appeal divested the trial court of jurisdiction over his motion for reconsideration). And while Appellant allegedly sought to call the cellmate as a witness regarding the affidavit at the record-reconstruction hearing, see footnote 11 above, this Court had directed that the hearing be held

solely for the purpose of completing the trial record, not to allow the record to be reopened to consider evidence discovered after the trial. The affidavit is properly not in the record as evidence, and it presents nothing for this Court to review. See *Graham v. Ault*, 266 Ga. 367, 367 (466 SE2d 213) (1996). See also *Mitchum v. State*, 306 Ga. 878, 880 (834 SE2d 65) (2019) ("[T]he discovery of new evidence that would be admissible at the defendant's criminal trial and that materially affects the question of the defendant's guilt or innocence is a proper subject of an extraordinary motion for new trial.").

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 8, 2020.

Murder. Hall Superior Court. Before Judge Oliver.

*Matthew P. Cavedon, H. Bradford Morris, Jr.*, for appellant.

*Lee Darragh, District Attorney, Wanda L. Vance, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.