309 Ga. 479
FINAL COPY

S20A0713.  BLACKSHEAR v. THE STATE.

BETHEL, Justice.

Ulysses Blackshear, Jr. was found guilty of malice murder and other crimes in connection with the death of William Land.[1] Blackshear appeals, challenging the sufficiency of the evidence as to each offense of which he was found guilty and sentenced. Blackshear also argues that the trial court erred by failing to apply the proper

[1] The crimes occurred between September 8 and September 9, 2013. On July 21, 2014, Blackshear was indicted by a Baker County grand jury for malice murder, felony murder predicated on robbery, felony murder predicated on aggravated assault, felony murder predicated on burglary, robbery, aggravated assault, and burglary in the first degree. At a jury trial held from July 20 to 22, 2015, Blackshear was found guilty on all seven counts. Blackshear was sentenced to life imprisonment without parole for malice murder, 20 years concurrent for robbery, and 20 years concurrent for burglary. The felony murder counts were vacated by operation of law, and the aggravated assault count was merged into the malice murder count for sentencing purposes. On August 26, 2015, Blackshear filed a motion for new trial and amended it through new counsel on January 4, 2018. After a hearing, the trial court entered an order denying the motion for new trial, as amended, on September 28, 2018. Blackshear filed a notice of appeal on August 20, 2018, which was amended on August 23, 2018. This case was docketed to this Court for its term commencing in April 2020 and was submitted for a decision on the briefs.

standard in considering his motion for new trial on the general grounds and that his trial counsel provided constitutionally ineffective assistance by not objecting to the admission of certain photographs from Land's autopsy. For the reasons stated below, we affirm.

The evidence presented at trial, viewed in the light most favorable to the verdicts, showed the following. Between 7:30 p.m. and 8:00 p.m. on Sunday, September 8, 2013, a friend visited 87-year-old William Land at Land's home. At around 10:00 a.m. the following day, a "Meals on Wheels" employee drove to Land's residence for a regularly scheduled delivery. Once there, the employee honked to signal that she had arrived — as she typically did — but unusually, Land did not come to meet her. The next morning, September 10, the same employee returned to Land's residence and knocked on his door. When Land did not answer, the employee went to the police department and requested a welfare check for Land. Later that afternoon, a hospice home care worker arrived at Land's residence and saw that his back door was open.

Once inside, the worker found Land deceased in his bed and called the police.

The medical examiner who performed Land's autopsy determined that Land suffered 14 head injuries, including severe skull fractures and brain hemorrhaging caused by blunt force trauma. Land also had numerous defensive wounds on the backs of his hands and left forearm. The medical examiner testified that, based on the nature of the injuries — particularly the shape of the skull fractures — the object used to inflict the blunt force trauma causing Land's death was consistent with "some type of a hammer."

At Land's house, investigators found a medication dispenser; the Sunday (September 8) medications were gone, but the Monday (September 9) medications were still in their container. On a wheelchair ramp outside Land's home, investigators located an empty paper coin roll that was dry despite recent rain. Land was known to collect antiques and coins. Investigators also found a blue post-it note that read "p-i-n" followed by four numbers. A matching blue post-it notepad was found on a dresser in Land's bedroom.  The

post-it note was submitted for fingerprint testing, and fingerprints taken from the note were determined to be a match for Blackshear.

Investigators interviewed two witnesses who saw Blackshear near Land's residence on the night of Land's death. One witness testified at trial that, on the evening of September 8, he saw Blackshear a half-mile away from Land's residence. The other witness, who lived a ten-minute walk away from Land, testified that, at around 2:30 a.m. on September 9, he saw Blackshear walking near the witness's residence.

Investigators learned that Blackshear "often hung out" with El Lorenzo Mott and Mott's girlfriend, Brittany Paul. On September 9, between 5:30 a.m. and 6:00 a.m., Blackshear came to Mott and Paul's residence, woke them up, and asked if Mott wanted to smoke. When Mott refused, Blackshear went to a convenience store, where he exchanged one-dollar coins for paper currency before returning to Mott and Paul's residence. Blackshear then asked if he could pay to take a shower, and Mott agreed. Before taking a shower, Blackshear went to a second convenience store to buy cigarettes and again

exchanged coins for paper currency. Paul gave investigators all of the clothing that Blackshear was wearing before his shower, including a white and black baseball cap with the word "Chicago" on it. On the cap were some red stains. The cap was submitted for DNA testing, and the stains were determined to be a match for Land's blood.

Investigators later obtained surveillance recordings from the two convenience stores. At trial, frame shots of the security recordings from the first convenience store showed Blackshear entering the store at 5:56 a.m. wearing a red shirt, dark pants, white shoes, and a white and black baseball cap with writing across the front. Frame shots of the security recording from the second convenience store showed Blackshear entering the store at 7:13 a.m. wearing the same clothing, but a different, beige cap.

Law enforcement officers eventually located Blackshear and subsequently conducted two separate interviews with him. During

his first custodial interview, after being given *Miranda* warnings,[2] Blackshear denied any involvement in Land's death. Later in the same interview, Blackshear blamed Mott and Paul for Land's death. Blackshear claimed that he ran into Mott and Paul at around 2:00 a.m. on September 9 as he was walking toward their residence. According to Blackshear, Mott then told Blackshear about a plan to rob Land, whereby Mott and Paul would enter Land's house while Blackshear remained outside as a lookout. Blackshear stated that, after Mott and Paul left to go toward Land's residence, he left his lookout post and went to spend the night at his friend's house. Blackshear's friend testified that Blackshear was at his home on the night of September 8 until early the next morning.

Blackshear told investigators that he went to Mott and Paul's residence the next day and described seeing Mott with coins on his table, a gold chain, some silver pocket watches, a black watch, and a wallet. Blackshear also told investigators that later, while waiting

---

[2] See *Miranda v. Arizona,* 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

in a car in Mott's driveway, he saw Mott burying the same items in the woods beside the house. At trial, investigators testified that the level of detail provided by Blackshear likely could not have been observed from the place where Blackshear was allegedly sitting. After investigators obtained a search warrant for the property, Blackshear led investigators to the woods beside the house, and investigators were able to recover the items and determine that they had belonged to Land. Blackshear also told investigators that Mott asked him about a debit card and how to change a pin number associated with a debit card. A debit card belonging to Land that was found inside Land's wallet was submitted for fingerprint testing, and the fingerprints were found to be a match for Blackshear. Additionally, during his first interview with law enforcement, Blackshear initially claimed that he had been wearing a blue shirt and shoes on the night of Land's death. He later stated that he had been wearing a red shirt and boots.

While executing the search warrant at Mott and Paul's residence, investigators also found a burn pile that included clothes

and shoes. Mott testified that he did not set the fire, but that another individual was using the burn pile to burn trash. That individual testified that he was with Mott and Paul from 6:00 p.m. to 2:00 a.m. on the night of September 8, that Mott and Paul had not left their residence while he was there, and that he was using the burn pile to burn trash.

During a second custodial interview, after again being given *Miranda* warnings, Blackshear stated that, while serving as a lookout for Mott and Paul during the robbery, he was "curious," looked inside the house, and saw Land's dead body on his bed before leaving the scene. Blackshear gave a detailed description of the position of Land's body. The interviewing officer testified that in his two interviews with law enforcement, Blackshear changed his account of the night in question between five and ten times. Blackshear was ultimately charged with malice murder and other crimes and elected not to testify at trial.

1. Blackshear argues that the evidence was insufficient to support his convictions, and that the State was required to exclude

every reasonable hypothesis other than his guilt because the evidence against him was circumstantial. Because Blackshear was not sentenced on the three felony murder counts and the aggravated assault count, his claims as to the sufficiency of the evidence supporting those counts are moot. See, e.g., *Mills v. State*, 287 Ga. 828, 830 (2) (700 SE2d 544) (2010). We thus limit our review to the sufficiency of the evidence presented at trial regarding the malice murder, robbery, and burglary counts.

When evaluating the sufficiency of evidence under the Fourteenth Amendment to the United States Constitution, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). Moreover, as a matter of Georgia statutory law, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. But

[n]ot every hypothesis is reasonable, and the evidence does not have to exclude every conceivable inference or hypothesis; it need rule out only those that are reasonable. The reasonableness of an alternative hypothesis raised by a defendant is a question principally for the jury, and when the jury is authorized to find that the evidence, though circumstantial, is sufficient to exclude every reasonable hypothesis save that of the accused's guilt, this Court will not disturb that finding unless it is insupportable as a matter of law.

(Citation and punctuation omitted.) *Cochran v. State*, 305 Ga. 827, 829 (1) (828 SE2d 338) (2019). "[I]t was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence. Likewise, it was for the jury to decide whether the defense theory . . . was reasonable and not excluded by the other evidence." (Citations and punctuation omitted.) *Bamberg v. State*, 308 Ga. 340, 343 (a) (1) (839 SE2d 640) (2020).

Here, the evidence presented at trial was sufficient to support Blackshear's malice murder conviction. Blackshear denied killing Land and argues that the State's evidence does not exclude the reasonable hypothesis that Mott and Paul committed the crimes.

However, the jury was authorized to accept the State's evidence and was not required to conclude that the hypothesis proposed by Blackshear was reasonable. See *Bamberg*, supra. The theory that Mott and Paul, but not Blackshear, killed Land, was established exclusively through Blackshear's custodial statements. But Blackshear gave inconsistent statements to investigators about his involvement in Land's death — initially denying any involvement, then later saying that he acted as a lookout during a robbery of Land but left before the robbery was complete. He later stated that he saw Land's body on the bed during the robbery. The evidence showed that Blackshear had specific knowledge about the exact location of Land's stolen items and the position of Land's body on the bed. Blackshear's fingerprints were found on a post-it note outside of Land's house and on one of Land's debit cards, and Land's blood was found on the hat Blackshear was seen wearing on convenience store security recordings made on the night of Land's death.

Likewise, the evidence was sufficient to support Blackshear's

robbery[3] and burglary[4] convictions. Specifically, the evidence presented at trial supports the conclusion that Blackshear entered Land's home without authority and for the purpose of committing theft because Blackshear's fingerprints were found at Land's home and on property that had been taken from Land. See *Dupree v. State*, 303 Ga. 885, 887 (1) (815 SE2d 899) (2018).

Based on the foregoing, the jury, as the trier of fact, was authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis other than that of Blackshear's guilt. See *Walker v. State*, 308 Ga. 33, 35-36 (1) (838 SE2d 792) (2020). Moreover, viewing the evidence in a light most favorable to the verdicts and deferring to the jury's assessment of the weight and credibility of the evidence, we conclude that the evidence was sufficient to authorize a rational trier of fact to find

---

[3] See OCGA § 16-8-40 (a) (1) ("A person commits the offense of robbery when, with intent to commit theft, he takes property of another from the person or the immediate presence of another . . . [b]y use of force[.]").

[4] See OCGA § 16-7-1 (b) ("A person commits the offense of burglary in the first degree when, without authority and with the intent to commit a felony or theft therein, he or she enters or remains within an occupied . . . dwelling house of another[.]").

Blackshear guilty beyond a reasonable doubt of the crimes of malice murder, robbery, and burglary. *Jackson,* 443 U. S. at 319 (III) (B).

2. Blackshear next argues that the trial court failed to properly exercise its discretion as the "thirteenth juror" when considering Blackshear's motion for new trial. We disagree.

In his motion for new trial, Blackshear raised only the "general grounds." See OCGA §§ 5-5-20; 5-5-21. In his amended motion for new trial, he also asserted that the evidence presented at trial was insufficient under *Jackson v. Virginia.* When a defendant challenges his conviction on the general grounds and contends the verdict was contrary to the evidence or lacked evidence to support it, a trial court has broad discretion to sit as the "thirteenth juror" and consider certain matters beyond the sufficiency of the evidence. See *Allen v. State,* 296 Ga. 738, 740 (2) (770 SE2d 625) (2015). These additional matters include conflicts in the evidence, the credibility of witnesses, and the weight of the evidence. See id.

In its order denying Blackshear's motion for new trial, the trial court stated that "[Blackshear's] motion was based on the general

grounds." This was the only mention of the general grounds in the order — there was no supplemental recitation of the general grounds standard or citation to OCGA §§ 5-5-20 or 5-5-21.

After acknowledging the general grounds, the order denying Blackshear's motion for new trial cited *Jackson v. Virginia* to support the trial court's conclusion that there was sufficient evidence to support Blackshear's convictions. Blackshear contends that this signifies that the trial court exercised the wrong standard by conflating its discretionary role as the "thirteenth juror" in evaluating the general grounds with its legal sufficiency review under *Jackson*. This contention fails.

When a trial court reviews the evidence presented at trial for sufficiency under *Jackson*, it does not exercise broad discretion as a "thirteenth juror" because determining whether evidence is sufficient "is a matter of law, not discretion." (Citation and punctuation omitted.) *Manuel v. State*, 289 Ga. 383, 386 (2) (711 SE2d 676) (2011). Here, while not a model of clarity, the trial court's order does not affirmatively indicate that it evaluated Blackshear's

general grounds claim as a matter of law under the *Jackson*
constitutional sufficiency standard. In short, the order does not show
that the *Jackson* standard for a sufficiency review was applied to the
general grounds enumeration, particularly because Blackshear also
raised a separate sufficiency claim in his amended motion for new
trial.  Thus, "[t]his is not a case where the trial court explicitly
declined to consider the credibility of the witnesses in denying the
defendant's motion for new trial or made clear its belief that it had
no discretion to grant a new trial despite disagreeing with the jury's
verdict." (Citation and punctuation omitted.) *Burney v. State,* 299
Ga. 813, 816 (1) (c) (792 SE2d 354) (2016).

Further, the trial court's acknowledgment of the general
grounds was an indication that it understood the independent and
discretionary nature of its review under OCGA §§ 5-5-20 and 5-5-21.

> [I]t is well established that this Court must presume that
> the trial judge knew the rule as to the necessity of
> exercising his discretion, and that he did exercise it. [The
> Court] can not assume, in the absence of positive evidence
> to the contrary, that the judge knowingly declined to
> exercise his discretion. Thus, where a trial judge ruling
> on a new trial motion enters an order that, without more,

recites that the new trial is refused or denied, this will be taken to mean that the judge has in the exercise of his discretion approved the verdict.

(Citations and punctuation omitted.) *Butts v. State*, 297 Ga. 766, 772 (3) (778 SE2d 205) (2015). Accordingly, the trial court's statement that "[Blackshear's] motion was based on the general grounds" adequately demonstrates that the trial court exercised its discretion as the "thirteenth juror" in denying Blackshear's motion for a new trial on the general grounds. This claim of error fails.

3. Blackshear next argues that his trial counsel provided constitutionally ineffective assistance because he did not object to the admission of certain photographs from Land's autopsy. We disagree.

To prevail on a claim of ineffective assistance of counsel, Blackshear bears the burden of proving both that his trial counsel's performance was deficient and that he suffered prejudice as a result of this deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To demonstrate deficient performance, "a defendant must show that trial counsel

performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." (Citation and punctuation omitted.) *Gaston v. State*, 307 Ga. 634, 636 (2) (837 SE2d 808) (2020). This requires the defendant to "overcome the strong presumption that trial counsel's performance was adequate." (Citation and punctuation omitted.) Id. To satisfy the prejudice prong, the defendant is required to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U. S. at 694 (III) (B). Because Blackshear must satisfy both prongs, this Court does not need to "address both components of the inquiry if [Blackshear] makes an insufficient showing on one." Id. at 697 (IV).

Blackshear contends that he received ineffective assistance because his trial counsel failed to object to the admission of three autopsy photographs that showed Land's head with the scalp and face pulled down. The medical examiner relied on 23 autopsy photographs, including the three photographs at issue, during his

testimony about the nature and extent of the injuries that caused Land's death, as well as what weapon was likely used to cause Land's injuries. Blackshear specifically argues that trial counsel should have objected because the three photographs now at issue were unduly inflammatory and irrelevant to any fact or matter that was not otherwise established through other, less gruesome, photographs and that those photographs were irrelevant given the defense theory Blackshear pursued.

However, Blackshear cannot establish that his trial counsel performed deficiently. "Trial tactics and strategy are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them." (Citation and punctuation omitted.) *Gomez v. State*, 301 Ga. 445, 459 (6) (a) (801 SE2d 847) (2017). Trial counsel testified at the motion for new trial hearing that he did not object to the introduction of the three photographs because they were not inconsistent with his defense theory that Mott, not Blackshear, had murdered Land. Trial counsel testified that although the

photographs at issue "make an impression" that Land's murder was "gruesome," counsel's overall strategy was "to get the jury on the trail of Lorenzo Mott." Counsel hoped that, to the extent the photographs inflamed the jury, any anger on the part of the jury would be directed to Mott. Trial counsel further testified that he did not object to the admission of the photographs because there was no dispute over the medical examiner's findings as to the nature and extent of Land's wounds or the cause and manner of Land's death. Trial counsel also believed that any objection as to the cumulative nature of the photographs would fail because it did not appear to him that the pre-autopsy photographs showed the same fractures to Land's face as the autopsy photographs at issue here.

Here, trial counsel's decision not to object to the admission of these photographs was not so patently unreasonable as to amount to deficient performance. Rather, acceding to their admission was a reasonable trial strategy, especially in light of counsel's plan to point to Mott as Land's killer. See *Gomez*, 301 Ga. at 459 (6) (a) (trial counsel did not perform deficiently by not objecting to testimony that

he believed he could turn to his client's advantage); *Hartsfield v. State*, 294 Ga. 883, 889 (3) (b) (757 SE2d 90) (2014) ("[I]t was a sound defense strategy to minimize objections in an effort to show the jury that the defense had nothing to hide."). This claim of ineffective assistance therefore fails.

*Judgment affirmed. All the Justices concur.*

DECIDED AUGUST 10, 2020.
Murder. Baker Superior Court. Before Judge Chason.
*Conger & Smith, Gregory D. Smith*, for appellant.
*Joseph K. Mulholland, District Attorney, Moruf O. Oseni, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew D. O'Brien, Assistant Attorney General*, for appellee.