311 Ga. 727
FINAL COPY

S21A0553.  TYLER v. THE STATE.

BETHEL, Justice.

A Richmond County jury found Charles Tyler guilty of felony murder, armed robbery, and other crimes in connection with the shooting death of David Fulkrod and theft of copper from a recycling facility. On appeal, Tyler challenges the sufficiency of the evidence as to all of his convictions. Because the evidence was sufficient to support each conviction, we affirm.[1]

---

[1] The crimes occurred on June 4, 2008. In September 2008, a Richmond County grand jury indicted Tyler for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), armed robbery (Count 3), burglary (Count 4), possession of a firearm during the commission of a felony (Count 5), and possession of a firearm by a convicted felon (Count 6). At a jury trial held from August 31 to September 3, 2009, Tyler was found not guilty on Count 1 and guilty on Counts 2 through 5. The State elected not to pursue Count 6, for which the trial court entered an order of nolle prosequi. The trial court sentenced Tyler to consecutive sentences of life in prison on Counts 2 and 3, a consecutive term of 20 years in prison on Count 4, and a consecutive term of five years in prison on Count 5. On September 10, 2009, Tyler filed a motion for new trial, which he subsequently amended. The trial court denied the motion for new trial, as amended, on December 16, 2015, and Tyler filed a timely notice of appeal on December 30, 2015. The case was docketed in this

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. In the weeks preceding the murder, CMC Recycling Augusta in Richmond County terminated Tyler's employment with the company. During the afternoon of June 3, 2008, Tyler rented a U-Haul box truck and a storage unit.

In the early morning hours of June 4, Fulkrod was working as a security guard at CMC Recycling. He was stationed at a guard shack at the facility's entrance where he would maintain a log recording the names of people arriving, their times of arrival, and other activity. He spoke to his supervisor at 3:00 a.m. and documented that he "made rounds" between 3:30 and 3:45 a.m. Fulkrod left a voicemail with his supervisor that all was clear at around 4:00 a.m. Fulkrod began an entry with a time notation of

Court on April 27, 2017, as case number S17A1524, but was remanded to the trial court on June 30, 2017, so that the complete record of the proceedings could be transmitted to this Court. On January 28, 2019, the trial court entered an order certifying that the record was complete and ordering the clerk of court to transmit the complete record to this Court upon the filing of a new notice of appeal by Tyler. On February 15, 2019, Tyler filed a notice of appeal. This case was docketed in this Court to the April 2021 term and submitted for a decision on the briefs.

4:40 a.m., but there was no description of what happened at that time.

At around 5:30 a.m., another employee arriving for work found the gate open but did not see anyone in the guard shack to grant him entrance. The employee exited his vehicle, looked through the guard shack window, and observed Fulkrod lying in a pool of blood. Fulkrod had been shot in the head and died from his wounds. A 9mm cartridge casing was found next to Fulkrod's body.

Investigators discovered that a copper bale was missing from the "lower" warehouse. A forklift, normally stored in the "upper" warehouse, was also out of place, and a welding torch appeared to have been used to cut the upper warehouse lock. Investigators also located forklift tire tracks leading to the lower warehouse and tire tracks from a vehicle with four rear tires leading from the company's front entrance to a lane between the upper and lower warehouses and back out. They also located work boot impressions in the dirt at the crime scene, a pair of bolt cutters, and a destroyed lock by the front entry gate.

The police provided information about the incident to the public and requested reports of anyone seen in possession of large amounts of copper. On June 5, the police received a call from a man reporting that on the preceding day at approximately 5:45 a.m., he was driving behind a U-Haul truck and observed "a big cube of metal" that "looked like copper" in the back of the truck.

At around 7:00 a.m. on June 5, investigators discovered a large copper cube in a delivery area of a grocery store. About seven miles away from the grocery store, the police found Tyler lying beside a U-Haul truck in the parking lot of a gas station. Tyler initially gave the police a false name, and after being given *Miranda* warnings,[2] Tyler told investigators that he was using the U-Haul truck to move himself and his wife from his mother's house into a new apartment. Tyler was then transferred to a hospital to be treated for dehydration.

That same day, Tyler's wife told investigators that she had

---

[2] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

been living with her mother and was not moving into a new apartment with Tyler. She also stated that she brought Tyler a broom at his request to clean out the U-Haul. Tyler's mother told investigators that she had not seen her son in five years. When investigators returned to the hospital later that day and told Tyler what they had learned from his wife and mother, Tyler could not provide an explanation, and "his eyes watered up with tears." Investigators also found copper scraps, a pallet, and some cardboard boxes on the floor of the U-Haul. When told of this discovery by investigators, Tyler denied that those items had been in the U-Haul when he rented it, but stated that he was the only one who had driven or had access to the truck. Investigators also found that the tires on the U-Haul had the same characteristics as the impressions left at the crime scene.

Investigators executed a search warrant at Tyler's storage unit and discovered approximately 2,700 pounds of copper in piles inside and copper bits scattered around outside the unit. The amount of copper discovered in the storage unit and behind the grocery store

was consistent with the amount of copper stolen from CMC Recycling. Investigators then returned a third time to speak to Tyler and again gave *Miranda* warnings to Tyler before questioning him. Tyler initially denied renting a storage unit, but when investigators revealed proof that he had done so, Tyler admitted that he rented the unit. Tyler admitted that the storage unit's key was on a lanyard that officers had taken from him and stated that no one else had the key. However, he denied that there was any copper in the unit and disputed the account of a maintenance man who reported having backed the U-Haul into the unit at Tyler's request on the evening of June 4.

The police searched Tyler's apartment and found work boots that matched the impressions documented at the crime scene. Investigators also recovered documents in the apartment related to renting a forklift, and notes detailing U-Haul truck rental costs and weight limits, as well as documents listing various CMC Recycling locations throughout the Southeast. Additionally, investigators found Tyler's resume, which listed that he was previously a

6

construction welder and that his skills included forklift operation.

2. In two separate enumerations of error, Tyler challenges the sufficiency of the evidence presented at trial. Tyler first argues that the evidence was insufficient to support his convictions because the State did not establish each element of the offenses and because the evidence was circumstantial, did not establish that he actively engaged in any of the crimes, and did not preclude the possibility that someone else committed the crimes. Tyler also argues that the evidence was legally insufficient to sustain his convictions for armed robbery and possession of a firearm during the commission of a felony because it was equally possible that the copper was taken before Fulkrod's shooting, and thus a jury could not find that the robbery was accomplished by use of force. For the reasons explained below, each of these contentions fails.

When evaluating the sufficiency of evidence as a matter of federal due process under the Fourteenth Amendment of the United States Constitution, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a

reasonable doubt. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). This Court views the evidence in the "light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." (Citation and punctuation omitted.) *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013). The jury's resolution of these issues "adversely to the defendant does not render the evidence insufficient." (Citation and punctuation omitted.) *Graham v. State*, 301 Ga. 675, 677 (1) (804 SE2d 113) (2017).

Further, as a matter of Georgia statutory law, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." See former OCGA § 24-4-6.[3] Whether an alternative hypothesis is reasonable or whether the circumstantial evidence excludes every

---

[3] This case was tried prior to the current Evidence Code becoming effective in 2013. However, this provision "was carried forward into the new Evidence Code, and it now can be found at OCGA § 24-14-6." *Gibson v. State*, 300 Ga. 494, 495 (1) n.4 (796 SE2d 712) (2017).

reasonable hypothesis save that of guilt is generally a question left to the jury, and this Court "will not disturb that finding unless it is insupportable as a matter of law." *Johnson v. State*, 307 Ga. 44, 48 (2) (834 SE2d 83) (2019). "[I]t was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence. Likewise, it was for the jury to decide whether the defense theory . . . was reasonable and not excluded by other evidence." (Citations and punctuation omitted.) *Bamberg v. State*, 308 Ga. 340, 343 (1) (a) (839 SE2d 640) (2020).

We first consider the sufficiency of the evidence presented as to the offense of felony murder predicated on aggravated assault. OCGA § 16-5-1 (c) provides that "[a] person commits the offense of murder when, in the commission of a felony, he or she causes the death of another human being irrespective of malice." Tyler's felony murder conviction was predicated on his aggravated assault of Fulkrod. OCGA § 16-5-21 (a) (2) provides, in relevant part, that "[a] person commits the offense of aggravated assault when he or she assaults . . . [w]ith a deadly weapon[.]" A person commits an assault

when he or she "[a]ttempts to commit a violent injury to the person of another [or c]ommits an act which places another in reasonable apprehension of immediately receiving a violent injury." OCGA § 16-5-20 (a) (1), (2).

Here, the evidence presented at trial was sufficient to support Tyler's conviction for felony murder predicated on aggravated assault. The jury could conclude from the evidence presented at trial and summarized above that Tyler shot Fulkrod so that he could steal copper from CMC Recycling.

Likewise, the evidence was sufficient to support Tyler's conviction for burglary. Under the statute in effect at the time of the crimes, OCGA § 16-7-1 (a) provided that "[a] person commits the offense of burglary when, without authority and with the intent to commit a felony or theft therein, he . . . enters or remains within any other building . . . or any room or any part thereof. . . ." Here, the evidence presented at trial authorized the jury to determine that Tyler entered the CMC Recycling upper and lower warehouses without authority and for the purpose of stealing copper. See

10

*Blackshear v. State*, 309 Ga. 479, 484 (1) (847 SE2d 317) (2020). The evidence was therefore sufficient to support his conviction for burglary.

Tyler was also convicted of armed robbery and possession of a firearm during the commission of a felony predicated on armed robbery or murder. OCGA § 16-8-41 (a) provides that "[a] person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon, or any replica, article, or device having the appearance of such weapon. . . ." A person commits the offense of possession of a firearm during the commission of a felony when he has within arm's reach or on his person a firearm during the commission of "[a]ny crime against or involving the person of another . . . and which crime is a felony[.]" OCGA § 16-11-106 (b) (1).

The indictment alleged that Tyler committed armed robbery in violation of OCGA § 16-8-41 "with the intent to commit theft, [by] tak[ing] copper, the property of CMC [Recycling, Inc.], from the

immediate presence of David Fulkrod, by use of a certain firearm[.]"[4] "The State therefore was required to prove beyond a reasonable doubt that [Tyler]'s use of the [firearm] occurred 'prior to or contemporaneously with the taking'" of the copper in order to sustain his conviction for armed robbery and unlawful possession of a firearm during that offense. (Citation omitted.) *Harrington v. State,* 300 Ga. 574, 577 (2) (a) (797 SE2d 107) (2017). A defendant may be convicted of committing a robbery if he kills the victim first and then takes property in his possession. See *Hester v. State*, 282 Ga. 239, 240 (2) (647 SE2d 60) (2007). The evidence was sufficient for the jury to conclude beyond a reasonable doubt that the State made such a showing here. The evidence showed that Fulkrod regularly recorded the name and time of people arriving at the gate, and there was an incomplete entry at 4:40 a.m. The jury could

---

[4] It is immaterial that the copper belonged to CMC Recycling, not Fulkrod. See *Holcomb v. State*, 268 Ga. 100, 104 (5) (485 SE2d 192) (1997) ("Robbery is a crime against possession, and is not affected by concepts of ownership. . . . [T]he gravamen of the offense of armed robbery is the taking of items from the possession of another by use of an offensive weapon, and not the ownership status of the item taken." (footnotes omitted)).

conclude that Tyler arrived in the rented U-Haul at the main gate and then shot Fulkrod before entering the property to complete the theft. Investigators located tire marks matching the rented U-Haul entering the main gate between the two warehouses, greatly diminishing the theory that Tyler gained entry to the facility through some other means. Further, from the evidence presented at trial, the jury could infer that he needed time to cut the upper warehouse lock with a welding torch and to drive the forklift from that warehouse to the lower warehouse to load copper onto the truck. And there was no evidence that Fulkrod was restrained in any way to keep him from calling the police while the theft was completed. Accordingly, as a whole, when viewed in the light most favorable to the verdicts, this evidence was sufficient for the jury to conclude that Tyler shot Fulkrod before stealing the copper. See *Lumpkin v. State*, 310 Ga. 139, 146 (1) (a) (849 SE2d 175) (2020) (evidence sufficient to prove defendant's use of an offensive weapon occurred prior to or contemporaneously with the taking); *Johnson v. State*, 307 Ga. 44, 49-50 (2) (b) (834 SE2d 83) (2019) (same). The

evidence was therefore sufficient to sustain his convictions for armed robbery and possession of a firearm during the commission of a felony as a matter of due process.

Finally, we consider Tyler's argument that the evidence was insufficient under former OCGA § 24-4-6. Tyler denied any involvement in the crimes and now argues that the State's evidence was circumstantial and did not exclude the possibility that someone else committed the crimes. However, significant physical evidence found by the police tied Tyler to the crimes, including a large volume of copper and copper scraps found in and around the storage unit and U-Haul that he had rented, work boots found in Tyler's possession the soles of which matched impressions found at the crime scene, and documentation detailing information on forklift and U-Haul rentals, U-Haul weight limits, and CMC Recycling locations, as well as a resume detailing Tyler's skills as a welder and forklift operator. The jury was authorized to accept the State's theory of the crimes and was not required to conclude that the hypothesis proposed by Tyler that someone else committed the

14

crimes was reasonable. See *Blackshear*, 309 Ga. at 483 (1).

Based on the foregoing, the jury was authorized to find that the evidence, even if considered entirely circumstantial, was sufficient to exclude every reasonable hypothesis other than that of Tyler's guilt as to each offense for which he was convicted. See former OCGA § 24-4-6; *Blackshear*, 309 Ga. at 484 (1). Moreover, viewing the evidence in the light most favorable to the verdicts and deferring to the jury's assessment of the evidence's weight and credibility, we conclude that the evidence presented at trial was sufficient as a matter of constitutional due process to authorize a rational trier of fact to find Tyler guilty beyond a reasonable doubt of the crimes of felony murder, armed robbery, burglary, and possession of a firearm during the commission of a felony. See *Jackson*, 443 U. S. at 319 (III) (B); see also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation omitted)).

*Judgment affirmed. All the Justices concur.*

15

Decided June 1, 2021.

Murder. Richmond Superior Court. Before Judge Brown.

*Michael W. Tarleton*, for appellant.

*Jared T. Williams, District Attorney, Joshua B. Smith, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Leslie A. Coots, Assistant Attorney General*, for appellee.