NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: August 23, 2022

S22A0796.  ADKINS v. THE STATE.

BETHEL, Justice.

After a jury trial, Marion Adkins, Jr. was convicted of malice murder and other crimes in connection with the shooting death of Latisha Gresham. He appeals, contending that the circumstantial evidence presented at trial failed to exclude all other reasonable hypotheses, such as the commission of the crime by some unknown assailant or Gresham's possible suicide, and was therefore insufficient to support his conviction. Adkins also argues that the trial court erred by not instructing the jury on "grave suspicion."[1]

---

[1] The crimes occurred on January 25 and 26, 2019. On April 2, 2019, an Athens-Clarke County grand jury indicted Adkins on the following counts: malice murder (Count 1); felony murder (Count 2); aggravated assault (Count 3); and possession of a firearm during the commission of a crime (Count 4). Following a jury trial held from June 21 to 24, 2021, Adkins was found guilty of all counts. The trial court sentenced Adkins to serve life in prison on Count

We disagree with both contentions and affirm.

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. In January 2019, Adkins was living in a house in Athens-Clarke County. Adkins and Gresham were in an on-and-off romantic relationship, and Gresham was a frequent houseguest of Adkins.

On January 25, Clarence Willis, Jr., Adkins's cousin, was at Adkins's residence with Adkins, Gresham, and Jabrea Lewis drinking and smoking. Willis had been staying with Adkins since late November 2018. This gathering lasted from around 7:30 p.m. until after 9:00 p.m., when Willis was picked up for work by Derrick Jones.

Willis testified that, as he was leaving for work, he thought he saw Adkins hit Lewis but that Adkins was probably "swinging trying

---

1 and a term of five years consecutive to Count 1 on Count 4. Count 2 was vacated by operation of law, and the trial court merged Count 3 with Count 1. Adkins timely filed a motion for a new trial on July 1, 2021, which he later amended through new counsel. After a hearing, the trial court denied the motion, as amended, on January 19, 2022. Adkins filed a notice of appeal on February 9, 2022. His case was docketed to this Court's April 2022 term and submitted for a decision on the briefs.

to touch her" in an attempt "to get her attention or something like that." Willis told Adkins he thought Adkins was being disrespectful, which caused a "slight argument" between Willis and Adkins on the front porch. During the argument, Willis tried to punch Adkins. After this altercation, which lasted two or three minutes, Gresham told Willis that she was afraid that when Willis left, Adkins would "do something to her." Willis told Gresham that she did not have to stay there and that Lewis would take her wherever she wanted to go.

Gresham then went inside to get her bag. Lewis went to her car and was waiting outside for Gresham as Willis left. Adkins went back inside after Gresham and shut the front door. Willis and Jones left. Lewis testified that Gresham never came back out before Lewis left. Adkins's sister, Marian Adkins, testified that Willis called her and said that Adkins's behavior towards Lewis was concerning and someone needed to "get him."

Willis worked until early in the morning and returned to the residence around 5:00 a.m. He was unable to get in the residence

3

because he had given his key to Adkins the previous evening. Willis called his cousin and Adkins's older sister, Aretha Ballard, and Ballard let him inside the residence. Once inside, Ballard warmed up her coffee in the kitchen, glanced down the hallway toward Adkins's room, saw a person lying in the hallway, and thought that it might be Gresham. Willis testified that Ballard said, "Look, Clarence, Junior[2] must have done put her out the room again." Ballard testified that she was not alarmed by this because she had seen Gresham sleeping on the floor, living room couch, or out on a couch on the screened-in porch before. Ballard called out to Adkins saying "Junior, Junior," and Adkins responded that he was asleep.

Ballard left the house, and Willis fell asleep on the couch by the front door for about two and a half hours. When Willis awoke, he noticed Gresham was still lying in the same spot where he and Ballard had seen her earlier that morning. Willis tried to rouse Gresham by asking her to get up, but Gresham did not respond. Willis used the restroom, came out into the hallway, and tried to

---

[2] Adkins sometimes went by "Junior."

move Gresham. It was dark in the hallway, and as Willis reached for Gresham, he felt a bag over her body. Willis then turned on a light and saw blood everywhere and a gun laying on the floor near Gresham. Following this discovery, Willis yelled out "Junior, Junior," but got no response. At 8:21 a.m., Willis walked out of the house with his cell phone and called 911.

When the police arrived, they found Gresham's body outside the closed bedroom door where Willis had found her. Gresham's body was outside the room and less than five feet from Adkins's bed. There was partially coagulated blood around Gresham's body, and it appeared that rigor mortis had set in. Gresham was laying on her stomach with her forehead facing down. A plastic bag was covering Gresham's head and part of her upper body, and a gun was on the ground beside her.

Adkins eventually emerged from his bedroom fully dressed and claimed that he had been sleeping. Adkins had not answered when police first arrived and announced their presence, and an officer testified that Adkins's bed did not appear to have been used recently.

The police took Adkins into custody.

At trial, a detective testified that he did not observe any sign of forced entry at the residence. The State introduced a photograph of the residence showing a closed side door, which was the only other door to the residence. The photographs showed that the side door appeared to be blocked by the back of a chair. In conjunction with the introduction of the photograph, the detective testified that the photograph depicted the side door as he saw it when he arrived. Another officer testified that the front window of the house had some broken glass and a "small hole," but also testified that it did not look like anyone had entered the residence through the area of broken glass.

The detective testified that, based on his 23 years of experience and working between 50 to 75 suicides involving firearms, Gresham did not die by suicide. The detective estimated that Gresham had been dead "well over" four hours, putting her time of death around 3:00 or 4:00 a.m.

The medical examiner testified that the manner of Gresham's

6

death was homicide and that the cause of her death was a gunshot wound to the head. The medical examiner determined that the bullet traveled from the front to the back of the head and very minimally right to left. The wound was not an impact wound that typically would have been self-inflicted. The medical examiner further testified that the gun appeared to have been fired from a range of six inches to three feet based on the lack of soot around the wound and the presence of stippling. There was no exit wound, and the medical examiner recovered a bullet, in fragments, from Gresham's body. On cross-examination, the medical examiner conceded that it was "potentially possible" that Gresham's death was a suicide but said that it was unlikely. The gun found next to Gresham's body was determined to have fired the fatal bullet.

Cherry Jackson, Gresham's older cousin with whom Gresham had a mother-daughter relationship, got several calls from Gresham either late at night on January 25 or in the early morning of January 26. During the final call around 2:00 a.m., Gresham said, "Mom, I'm okay; don't worry about me," and "Oh, I'm in the closet; here Junior

come," before hanging up the phone. Jackson testified that she was very concerned at the time due to the history of frequent calls when Gresham and Adkins would "get into it." Jackson testified, however, that she did not call 911 and did not investigate further because it was late, and her grandson advised against getting involved.

2. Adkins first argues that the evidence presented against him at trial was entirely circumstantial and failed to exclude other reasonable hypotheses aside from his guilt, and was therefore insufficient as a matter of Georgia law. In particular, Adkins argues that there was no direct evidence linking him to the murder or establishing that he was even present when Gresham died. Adkins further argues that the State failed to eliminate the possibility that someone else entered the residence at the time of Gresham's death or that Gresham committed suicide. Adkins's contentions lack merit.

Under OCGA § 24-14-6, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."

8

Whether an alternative hypothesis is reasonable or whether the circumstantial evidence excludes every reasonable hypothesis save that of guilt is generally a question left to the jury, and this Court will not disturb that finding unless it is insupportable as a matter of law.

(Citation and punctuation omitted.) *Tyler v. State*, 311 Ga. 727, 731 (2) (859 SE2d 73) (2021). Moreover,

it was for the jury to determine the credibility of witnesses and to resolve any conflicts or inconsistencies in the evidence. Likewise, it was for the jury to decide whether the defense theory . . . was reasonable and not excluded by other evidence.

(Citations and punctuation omitted.) *Bamberg v. State*, 308 Ga. 340, 343 (1) (a) (839 SE2d 640) (2020).

Adkins also argues that the State did not produce forensic evidence from the crime scene that directly linked him to Gresham's death. However, that does not mean the evidence presented was insufficient. "[T]he State is required to prove its case with competent evidence, [but] there is no requirement that it prove its case with any particular sort of evidence." (Citation omitted.) *Rich v. State*, 307 Ga. 757, 759 (1) (a) (838 SE2d 255) (2020). See also *Garay v. State*, No. S22A0073, 2022 WL 2230281, at *3 (Ga. 2022) (same).

Even though there was no direct evidence of Adkins's guilt, circumstantial evidence allowed the jury to infer that Adkins murdered Gresham. Shortly before Gresham was killed, she told Willis she was afraid of Adkins. Gresham was alone with Adkins in the house before her death, and no witness saw Adkins leave the residence – nor was there any evidence that Adkins intended to do so. Gresham told Jackson on the phone around the time she was estimated to have been killed that she was in the closet, and then she immediately hung up the phone after she said Adkins was coming toward her. When Willis and Ballard entered the house the next morning and first saw Gresham's body, Adkins was purportedly asleep in the bedroom close by. Adkins responded to Ballard's attempts to rouse him and was ultimately discovered in that same room when police responded to the 911 call. Testimony and exhibits regarding the layout of Adkins's house established that if he were not at home when Gresham died, he would have had to step over her body and the surrounding pool of blood to get into the room where he later said he had been sleeping.

Based on this evidence, the jury was free to reject as unreasonable the possibility that some other unknown assailant entered the home and murdered Gresham. See *Hughs v. State*, 312 Ga. 606, 609 (1) (b) (864 SE2d 59) (2021) (jury was authorized to reject as unreasonable the hypothesis that someone else in the home caused the victim's injuries where the evidence showed that defendant had been alone with the victim prior to her being found limp and unresponsive); *Tyler*, 311 Ga. at 733 (2) ("The jury was authorized to accept the State's theory of the crimes and was not required to conclude that the hypothesis proposed by [the defendant] that someone else committed the crimes was reasonable."); *Daniels v. State*, 298 Ga. 120, 123 (1) (779 SE2d 640) (2015) (jury authorized to reject as unreasonable the alternate theoretical possibility that an unknown individual committed the homicide where the evidence suggested otherwise).

Similarly, the jury was also free to reject as unreasonable Adkins's theory that Gresham committed suicide.

Whether suicide is a reasonable hypothesis was a

> question for the jury[,] and where circumstantial evidence is sufficient to exclude every reasonable hypothesis save that of the homicide at the hands of the accused, this Court will not disturb the guilty verdict unless it is unsupportable as a matter of law.

(Citation omitted.) *Walden v. State*, 289 Ga. 845, 846 (1) (717 SE2d 159) (2011). Although the medical examiner could not conclusively state that the fatal wound was caused by someone other than Gresham, she testified that she concluded that the manner of death was homicide, that the impact wound to the front of Gresham's head was not one that typically would have been self-inflicted, and that suicide was "unlikely." Moreover, a detective testified that based on his 23 years of experience and working between 50 to 75 suicides involving firearms, Gresham had not died by suicide. Based on this evidence, the jury, as the factfinder, was authorized to reject Adkins's self-serving hypothesis and conclude that Gresham's death was not a suicide. See id. (holding that evidence was sufficient for jury to reject theory that victim committed suicide even though pathologist could not conclusively state victim's death was caused by another person); *Evans v. State*, 271 Ga. 614, 615 (523 SE2d 850)

12

(1999) (holding that evidence was sufficient to determine that death was a homicide when the pathologist testified he was only 90 percent certain it was a homicide). Accordingly, although the State's case was circumstantial, the evidence presented at trial was sufficient under OCGA § 24-14-6 because the jury could determine that the evidence excluded other reasonable hypotheses regarding Gresham's death. This enumeration of error therefore fails.

3. Finally, Adkins argues that the trial court erred in refusing to charge the jury on "grave suspicion." We disagree.

"[T]o authorize a requested jury instruction, there need only be slight evidence supporting the theory of the charge." (Citation omitted.) *Stafford v. State*, 312 Ga. 811, 820 (4) (865 SE2d 116) (2021). Whether the evidence authorizes a requested jury instruction is a question of law, and when determining whether the trial court erred by not giving a requested instruction, this Court considers the instructions actually given by the trial court as a whole. See id.

Here, Adkins requested a pattern jury charge on grave

suspicion,[3] but the trial court declined to give the instruction, stating, "I don't ever give it. I don't think I'm required to. I think it's discretion and I just don't give it." Instead, the trial court instructed the jury on reasonable doubt, the presumption of innocence, and mere presence. In reviewing this issue in conjunction with Adkins's motion for a new trial, the trial court adhered to its decision to forego the charge on grave suspicion, reasoning that the charge was not required because the court gave an instruction on reasonable doubt and mere presence and because the evidence raised more than a grave suspicion of guilt.

We see no error in the trial court's decision not to give the requested charge on grave suspicion because the concept was covered in other jury instructions that the court did give to the jury. See *Lowe v. State*, 267 Ga. 180, 181 (2) (476 SE2d 583) (1996) (failure

---

[3] The pattern jury instruction for grave suspicion provides as follows: Facts and circumstances that merely place upon the defendant a grave suspicion of the crime charged or that merely raise a speculation or conjecture of the defendant's guilt are not sufficient to authorize a conviction of the defendant. Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.20.20.

to give instruction on "bare suspicion" not error where court gave "complete instructions on reasonable doubt, the presumption of innocence, and presence at scene of a crime"). See also *Welch v. State*, 309 Ga. 875, 879 (3) (848 SE2d 846) (2020) (no error in trial court's refusal to give charge on "grave suspicion" where evidence raised more than a grave suspicion of guilt and the court gave complete instructions on reasonable doubt and the presumption of innocence); *Jenkins v. State*, 281 Ga. 24, 25 (2) (635 SE2d 714) (2006) (same). As for the trial court's statement that it does not ever give an instruction on "grave suspicion," we caution against a blanket policy of never giving such a charge, which is in tension with the duty to give jury charges that are tailored to the evidence of each case. See *Cash v. State*, 297 Ga. 859, 863 (778 SE2d 785) (2015) ("The trial court's duty in delivering charges to the jury is to tailor those charges not only to the indictment but also adjust them to the evidence at trial. Any instructions should stand upon a base founded in evidence or lack thereof." (citation and punctuation omitted)). But the refusal to include the charge here was not error in light of the

balance of the charge given by the court. Accordingly, Adkins's claim of error fails.

*Judgment affirmed. All the Justices concur.*