**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: October 15, 2024

S24A0636.  THOMPSON v. THE STATE.

BOGGS, Chief Justice.

Appellant Willie Felix Thompson challenges his convictions for malice murder and other crimes in connection with the shooting death of Felicia Sullivan. Appellant contends that the evidence was legally insufficient to support his convictions and that the trial court plainly erred by giving separate, conflicting jury instructions on prior-bad-acts evidence and prior-difficulties evidence. We conclude that the evidence presented at trial was sufficient as a matter of federal constitutional due process to authorize the jury to find Appellant guilty of the crimes of which he was convicted. Additionally, Appellant has failed to demonstrate any clear or obvious error by the trial court in providing jury instructions on prior-bad-acts evidence and prior-difficulties evidence. Accordingly,

we affirm.[1]

1. Viewed in the light most favorable to the verdicts, the evidence at trial shows as follows. Appellant and Felicia Sullivan[2] began dating in 2015 after meeting on an online dating site. The two "talked" periodically over five years and eventually moved in together at a residence on Goldie Drive in Marietta in September 2020.

Sullivan's cousin, Mechelle McBride, who Sullivan talked with daily, testified regarding several violent interactions between Appellant and Sullivan. McBride testified that in 2018 Sullivan

---

[1] The crimes occurred on April 19, 2021. On July 1, 2021, a Cobb County grand jury indicted Appellant for malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony. Appellant was tried from April 18 to 22, 2022. The jury found Appellant guilty of all charges. On April 22, 2022, the trial court sentenced Appellant to life in prison without the possibility of parole for malice murder and a consecutive term of five years for the weapons charge. The felony murder count was vacated by operation of law. Although the trial court purported to vacate the aggravated assault count by operation of law, the count is merged as a matter of fact into the malice murder charge. See, e.g., *Smith v. State*, 301 Ga. 79, 80-81 (799 SE2d 762) (2017). On April 26, 2022, Appellant filed a motion for new trial, which he amended with new counsel on May 1, 2023. The trial court held an evidentiary hearing on June 20, 2023, and denied the motion on August 25, 2023. Appellant filed a timely notice of appeal, and the case was docketed in this Court to the April 2024 term and submitted for a decision on the briefs.

[2] Sullivan also went by the nickname "Tiny."

2

called her because Appellant slapped Sullivan in the mouth when arguing about money. In 2019, Appellant choked and threw Sullivan against a wall, causing Sullivan to attempt to "knee him in the private" to get him off.

At trial, Officer Aaron Johnson of the Marietta Police Department testified that on November 23, 2020, he responded to a domestic dispute call at the Goldie Drive residence involving Appellant and Sullivan. Sullivan told Officer Johnson that Appellant was intoxicated and threatened to hit her, balled up his fist, and snatched Sullivan's phone away while she was speaking with the 911 operator. Appellant had Sullivan's phone when the officers arrived. Officer Johnson attempted to talk with Appellant, but he was uncooperative. Subsequently, Appellant was placed under arrest for interfering with a 911 call. As Officer Johnson escorted Appellant to the police cruiser, Officer Johnson heard Appellant say something to the effect of "[S]he better be gone[,] or I'm going to burn this place down."

The same night as Appellant's arrest, Sullivan called McBride

3

to explain what happened, detailing that Appellant was drunk and pointed a gun at her face. About a week later, Sullivan was speaking with McBride over the phone when McBride overheard Appellant tell Sullivan, "B**ch I will kill you," to which Sullivan replied she would "F**k him up."

At trial, Appellant testified in his own defense as follows: Appellant had not been living at the Goldie Drive residence prior to the shooting, due to ongoing issues with Sullivan. Instead, he had been living back and forth between a nearby motel in Marietta and visiting family in Mississippi. He ultimately decided to move to Mississippi. On April 19, 2021, he returned to the Goldie Drive residence to collect the remainder of his belongings. However, he did not bring any moving boxes or a moving truck. And upon arrival, instead of packing, he began grilling in the backyard with his pistol on him. Appellant testified that he always carried his Hi-Point nine-millimeter pistol when in the backyard because of the nearby wooded area and his concern about potential intruders.

After grilling, he left to go to the store. Upon returning, he

4

attempted to put some meat in the kitchen and store his pistol in the main bedroom. As he entered through the back door of the house — with his pistol in hand — Sullivan, who Appellant claimed was intoxicated, began cursing at him. According to Appellant, Sullivan was positioned near the back door entrance such that he "brushed past her" upon entering. After he brushed up against her, "she put her hands on [him] and pushed [him] into the wall and grabbed [his] wrist." He told her to leave him alone and then walked into the hallway leading to the main bedroom. Sullivan followed him and "pushed [him] again and grabbed [his] wrist." The two then began a struggle in the hallway. Appellant claimed that Sullivan hit him in the head with an unknown heavy object, and then "everything went dark." After he was hit, two gunshots went off, both hitting Sullivan.[3] The medical examiner later testified that one bullet entered near her mouth, breaking her mandible, exiting her mouth

---

[3] After conducting an gunshot primer residue ("GSR") analysis, forensics experts concluded that Appellant "either discharged a firearm, was in close proximity to a firearm upon discharge, or came into contact with an Item whose surface had GSR, like a recently discharged firearm."

and then reentering her neck, and finally exiting through her back. The other bullet entered from the midline of her neck, striking an artery and then exiting through her back.[4]

Upon being wounded, Sullivan left the hallway and entered the main bedroom, where she slumped down in between the bed and TV dresser. Appellant went into the room to ask Sullivan if she was "ok," but she was unresponsive. Appellant did not call 911 because, he claimed, his phone number was registered in Illinois and when he had on a previous unrelated occasion attempted to call 911, the call was directed to Illinois police. Appellant instead video-called his sister, Angela Thompson, who lived in Oxford, Mississippi. Appellant, hysterically crying, told Angela "[H]e shot Tiny." He further said that Sullivan had been "talking mess and walking up on him." Angela told Appellant to call 911, but he did not. So, Angela

_____

[4] The medical examiner testified that although there was no way to determine which wound occurred first, the bullet wound near Sullivan's mouth was fired from about "[a] foot and a half, two feet to maybe up to three feet, maybe . . . two and a half, . . . two." The wound that entered her neck was fired from a distance greater than approximately two to three feet away. The downward angle of the entry and exit wounds suggested that Sullivan was leaning forward when she was shot.

asked her aunt, Lula Patton, who was with her when Appellant called, to contact Lula's son, Alvin Patton, in Georgia and have him go to the Goldie Drive residence to see "what was going on." It took Alvin approximately 30 to 40 minutes to get there. Once he arrived, he called Lula to tell Appellant to come outside. When Appellant came out, Alvin asked him what happened, and Appellant responded that "he had shot her." Alvin asked whether 911 had been called, and Appellant said no. Alvin immediately called 911, and police officers arrived shortly after. Once officers arrived, they began life-saving procedures on Sullivan, moving her from the main bedroom to the hallway to the living room.

EMS arrived shortly after and began to render aid. Meanwhile, officers started questioning Appellant outside. Officers noted that Appellant appeared intoxicated at the time of questioning. When asked what happened, Appellant said he came home about "10 or 15 minutes" ago to find Sullivan shot. The officers then spoke to Angela over the phone and Alvin in person at the scene, who both said that Appellant told them that he shot Sullivan. At that point, the police

7

detained Appellant. Sullivan was pronounced deceased at the crime scene.

Detectives recovered a nine-millimeter pistol on the bed in the main bedroom, a nine-millimeter shell casing in the hallway outside the bedroom, a spent bullet underneath the bed in the main bedroom, several empty beer cans in the trash can and two on the kitchen table and discovered a bullet hole in the bedroom mirror that exited out of a window behind the mirror. Detectives also found a shell casing lodged in the chamber of the pistol.

2. Appellant contends that the evidence was constitutionally insufficient under *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979), because the testimony and other evidence relied upon by the State did not show Appellant was guilty beyond a reasonable doubt. Moreover, he contends that his fear of being hit by the allegedly larger, intoxicated Sullivan, along with their altercation just before the shooting, supported his justification defense and did not authorize the jury to reject that defense.

When properly viewed in the light most favorable to the

8

verdicts, the evidence presented at trial and summarized above was sufficient as a matter of constitutional due process to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson*, 443 at 319. See also *Anthony v. State*, 298 Ga. 827, 829 (785 SE2d 277) (2016) ("The jury is free to reject any evidence in support of a justification defense and to accept the evidence that the shooting was not done in self-defense."); *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (cleaned up)).

Here, witnesses testified regarding Appellant's history of being violent toward Sullivan, including slapping and choking her, as well as threatening to kill her. See *Lackey v. State*, 286 Ga. 163, 164-165 (686 SE2d 112) (2009) (holding that the evidence was constitutionally sufficient to authorize a defendant's convictions for malice murder and possession of a firearm during the commission of a felony where, although a defendant claimed

that the shooting was unintentional, there was testimony that the defendant was angry with the victim at the time of the crimes). Appellant also admitted to Angela and Alvin that he shot Sullivan but offered police a different version of events when questioned about what occurred. See *Blackshear v. State*, 309 Ga. 479, 482-484 (847 SE2d 317) (2020) (concluding that the evidence was constitutionally sufficient to authorize a defendant's malice murder conviction where a defendant gave inconsistent statements to police about involvement in a victim's death). Forensic evidence also showed that gunshot primer residue was found on Appellant's hands, and bullet holes were found in the bedroom mirror despite Appellant's claim that the shooting took place in the hallway. Ballistics evidence further indicated that although it was unclear which wound Sullivan suffered first, the shots were fired from varying distances. The shot that entered near Sullivan's mouth was fired from approximately a foot and a half to up to three feet away. The shot that entered her neck was fired from a distance greater than at least two and a half to three feet. Accordingly, this

evidence undermined Appellant's claim that the shots were fired when he and Sullivan were engaged in a struggle. As such, the evidence was indeed sufficient to authorize a jury to find Appellant guilty beyond a reasonable doubt of malice murder and the weapons charge. *Davenport v. State*, 309 Ga. 385, 386 n.1, 388-389 (846 SE2d 83) (2020) (holding that the evidence was constitutionally sufficient to support convictions for malice murder and possession of a firearm during the commission of a felony where "[i]nvestigators . . . found gunshot primer residue on [the defendant's] clothes," the defendant "gave inconsistent stories to police, and he had a history of physical violence and threats toward [the victim]").

3. Appellant next argues that the trial court plainly erred by giving conflicting instructions to the jury on prior-bad-acts evidence and prior-difficulties evidence with respect to the same evidence. See OCGA § 17-8-58 (b). Appellant, however, has failed to demonstrate that the trial court made a clear or obvious error, so he claim of plain error fails.

Prior to trial, the State filed a motion to admit "Other Acts" evidence that would be introduced through the testimony of McBride and Officer Johnson. See OCGA § 24-4-404 (b). Their testimony regarding Appellant's previous violent interactions with Sullivan would be used to establish intent and absence of mistake, as well as showing prior difficulties between Appellant and Sullivan. See id. Counsel for Appellant indicated that he had no objection to the State introducing such evidence, nor does Appellant challenge the ruling admitting the evidence. The parties also agreed that a limiting instruction would be given before the introduction of said evidence.

Prior to Officer Johnson testifying about the November 2020 domestic dispute involving Appellant and Sullivan, the trial court gave the following limiting instruction:

> Sometimes evidence is admitted for a limited purpose or against some parties and not others or for some counts and not others. Such evidence may be considered by the jury for the sole issue or purpose against that party only for the counts for which the evidence is limited and not for any other purpose.
> In order to prove its case in Counts 1, 2, and 3, the State must show intent and must negate or disprove mistake or accident. To do so, the State has offered

evidence of other acts allegedly committed by the accused.

You are permitted to consider that evidence only insofar as it may relate to those issues and not for any other purpose. You may not infer from such evidence that the defendant is of a character that would commit such crimes.

The evidence may be considered only to the extent that it may show the issues that the State is required or authorized to prove in the crimes charged in the case now on trial. Such evidence, if any, may not be considered by you for any other purpose.

The defendant is on trial for the offenses charged in this bill of indictment only and not for any other acts. Before you may consider any other alleged acts for the limited purposes stated, you must first determine whether it is more likely than not that the accused committed the other alleged acts.

If so, you must then determine whether the acts shed any light on the issues for which the act was admitted in the crimes charged in the indictment in this trial. Remember to keep in mind the limited use and the prohibited use of this evidence about other acts of the defendant.

By giving this instruction, the Court in no way suggests to you that the defendant has or has not committed any other acts nor whether such acts, if committed, prove anything. This is solely a matter for your determination.

In its closing instruction to the jury, the trial court gave a

virtually identical instruction as the one above.[5] The trial court also provided the below instruction regarding prior difficulties at the close of trial:

> Evidence of prior difficulties or lack thereof between the defendant and the alleged victim have been admitted for the sole purpose of illustrating, if it does, the state of feeling between the defendant and the alleged victim, the reasonableness of any alleged fears by the defendant or alleged victim. Whether this evidence illustrates such matters is a matter solely for you, the jury, to determine, but you are not to consider such evidence for any other purpose.

The instructions given by the trial court comported with the language of the applicable Georgia Suggested Pattern Jury Instructions. See Suggested Pattern Jury Instructions, Vol. II Criminal Cases §§ 1.34.00 (Limiting Instructions/ Purpose, Parties, Counts); 1.34.10 (Other Crimes, Wrongs, Acts (formerly Similar Transactions)); 1.34.20 (Prior Difficulties between Parties (Witness) (or lack thereof)).

---

[5] The trial court omitted the first paragraph of the "Other Acts" instruction given prior to Officer Johnson's testimony.

14

Appellant urges that the trial court committed plain error by instructing the jury to evaluate evidence of Appellant's physical violence against Sullivan using jury instructions for both Rule 404 (b) prior bad acts and prior difficulties.[6] He contends that these instructions were inconsistent and likely left the jury confused about how to properly evaluate this evidence during deliberations.

> To show plain error, [Appellant] must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity or public reputation of judicial proceedings.

*State v. Williams*, 308 Ga. 228, 231 (838 SE2d 764) (2020) (cleaned up).

Here, Appellant has failed to satisfy the second prong of plain error review. Appellant does not cite any legal authority or precedent holding that a trial court erred in connection with

---

[6] Plain error applies because Appellant did not object to the instructions at issue during trial. See *Simmons v. State*, 291 Ga. 705, 712 (733 SE2d 280) (2012) ("When a party fails to object to a jury charge or the omission of a charge during trial but raises the issue on appeal, this Court reviews the charge for plain error.").

providing jury instructions on prior-bad-acts evidence and prior-difficulties evidence on the same piece of evidence, nor have we found any. See *Sconyers v. State*, 318 Ga. 855, 862 (901 SE2d 170) (2024) (holding that the defendant failed to show plain error with regard to the trial court's pattern charge on prior difficulties, in part, because the defendant "pointed to no controlling precedent holding that a trial court erred in connection with the pattern charge on prior difficulties"); *McKibbins v. State*, 293 Ga. 843, 853-854 (750 SE2d 314) (2013) (seeing no plain error where Appellant pointed to no decision holding that failing to define "accomplice" in the pattern charge on accomplice testimony was error). See also *Baker v. State*, ___ Ga. ___, ___ (902 SE2d 645, 651) (2024) (concluding there was no plain error where the defendant failed to point to any binding case law to support that an additional instruction on bias was required on the record, nor did this Court find any). Therefore, this enumeration of error fails. See *Hill v. State*, 310 Ga. 180, 194 (850 SE2d 110) (2020) ("The Court need not analyze all of the elements of the plain error test when the appellant fails to establish one of

16

them.").

*Judgment affirmed. All the Justices concur.*